**UNITED STATES of America, Appellee,**

v.

**James A. WINSTEAD, Appellant.**

No. 94–3025.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 8, 1995.

Decided Feb. 2, 1996.

Lisa B. Wright, Assistant Federal Public Defender, argued the cause for appellant, with whom A.J. Kramer, Federal Public Defender, Washington, DC, was on the briefs.

Matthew G. Olsen, Assistant United States Attorney, argued the cause for appellee, with whom Eric H. Holder, Jr., United States Attorney, and John R. Fisher, Thomas C. Black and Heather L. Cartwright, Assistant United States Attorneys, were on the brief. Elizabeth Trosman, Assistant United States Attorney, Washington, DC, entered an appearance.

Before: EDWARDS, Chief Judge, BUCKLEY and WILLIAMS, Circuit Judges.

Opinion for the Court filed by Chief Judge EDWARDS.

HARRY T. EDWARDS, Chief Judge:

On November 22, 1993, a jury found appellant James Winstead guilty of ten counts of mail fraud, in violation of 18 U.S.C. § 1341 (1988), and six counts of making false statements to a federal agency, in violation of 18 U.S.C. § 1001 (1988). Winstead contends that these convictions must be reversed because the District Court improperly questioned two witnesses. Winstead also asserts that he was deprived of a jury verdict on the false statement charges because the jury was improperly instructed as to the requisite elements of that crime. Finally, Winstead claims that, because three bench conferences held during his trial could not be transcribed due to a mechanical failure and could not be reconstructed by the parties, his right to appeal his convictions was unfairly jeopardized, and, therefore, a retrial on all counts is required.

We reject Winstead's contentions. First, we find that the District Court's questioning of witnesses did not jeopardize Winstead's right to a fair trial. Second, on the record at hand, it is clear that the jury was instructed to consider the materiality of appellant's statements before convicting him on the mail fraud charge, so there can be little doubt that the jury also would have found those state-

ments material with respect to the false statement charge. Only one fraudulent scheme was at issue with respect to both charges, so the court's instruction to the jury that materiality was an element of the mail fraud charge ensured that that element would have been found with respect to the false statement charge. The instructions were not a model of clarity, but they are not a cause for reversal. Third, Winstead's additional complaint, raised for the first time on appeal, that the jury was not informed that the jurisdiction of a federal agency is necessary under 18 U.S.C. § 1001, did not result in prejudicial error; therefore, under the plain-error standard, there is no warrant for the reversal of his false statement convictions. Finally, because there is no indication that the bench conference transcripts have been illegally withheld from Winstead, or that the transcripts would be likely to contain information relevant to an appeal, we decline to reverse his convictions on that ground.

## I. BACKGROUND

In late 1982, the Department of Labor ("DOL") granted Winstead Federal Employees' Compensation Act ("FECA") benefits based upon an injury to his back that occurred during his employment as a custodian at Walter Reed Medical Center. As part of the administration of these benefits, DOL's Office of Worker's Compensation Programs periodically required Winstead to complete and submit a form that was used to determine his qualification for continued benefits. This form, CA–EN1032 ("Form 1032"), requests information about the preceding fifteen-month period, including data about the disability recipient's employment history during that time.[1]

Winstead was still receiving FECA disability payments when, in 1985, he began to work as a computer aide in a District of Columbia high school, and when, in 1986, he

---

1. For example, according to the indictment, Part A of Form 1032 asks the following:
   1.a) "Were you employed by an employer during the time period covered by this form? Answer Yes or No."
   1.b) "If yes, provide the following information for each employer: *NAME/ADDRESS OF EMPLOYER DATES EMPLOYED RATE OF PAY KIND OF WORK.*"

   2.a) "Were you self-employed during any time covered by this form? Answer Yes or No."
   3. "Were you unemployed for all periods during the previous fifteen months not covered under 1 or 2 above? Answer Yes or No: ___ If not, explain."
   See *United States v. Winstead*, Crim. No. 93–0331, Indictment ¶ 1F, reprinted in Appendix ("App.") 2–3.

reenlisted as a member of the District of Columbia National Guard. Nonetheless, Winstead filled out six Form 1032s, between October 1988 and September 1992, in which he failed to disclose this employment. The allegedly false statements on these forms led to his indictment for six violations of 18 U.S.C. § 1001;[2] United States Treasury Department disability checks totaling over $53,000 that had been mailed to Winstead between December 1988 and February 1992 resulted in his being charged with ten mail fraud violations under 18 U.S.C. § 1341.[3]

## A. Winstead's Trial

In opening argument, both the prosecution and defense counsel made it clear that it would not be disputed that Winstead "was indeed injured ... and had disability payments awarded to him." Trial Tr. (Nov. 23, 1993) at 10–11; *see also id.* at 7. Instead, the central issue was whether Winstead knowingly misrepresented his employment status to DOL.

The Government's case-in-chief focused on witnesses who identified the forms Winstead completed and the representations he made to DOL. A former DOL special agent testified about a meeting that she had with Winstead on July 11, 1991, during which she asked him about his disability benefits and obtained from Winstead a Form 1032 with false statements on it. *See generally* Trial Tr. (Nov. 24, 1993) at 46–66. This meeting was videotaped and, after an appropriate foundation was laid, portions of the tape were introduced into evidence and played for the jury.

The Government also set out to establish the payments that had been made to Winstead, both from the U.S. Treasury for the disability benefits, and from his employers, the D.C. Government and the D.C. National Guard. A representative of the D.C. Government testified that, between 1986 and 1992, Winstead had received between $17,700 and $21,300 per year in compensation. Trial Tr. (Nov. 23, 1993) at 184. Sergeant James Thomas of the Personnel Department of the D.C. National Guard similarly identified Winstead's enlistment and compensation records, noting that, between 1988 and 1992, Winstead was entitled to receive between $1,300 and $2,400 per fiscal year as compensation for attendance at monthly drills and annual training. Trial Tr. (Nov. 24, 1993) at 28–29.

On cross-examination of Sergeant Thomas, Winstead's counsel brought out that appellant missed 16 drill sessions between 1986 and 1990. *Id.* at 36–37. Following this cross-examination, the trial judge questioned Sergeant Thomas:

> THE COURT: Does a National Guardsman get paid for a drill that he misses?
>
> THE WITNESS: No, he does not, sir. That's the question that wasn't asked. No, he does not. That leave and earnings statement is blank. It says, "No drill performance."
>
> THE COURT: No, drill, no pay?
>
> THE WITNESS: No money. No money is earned.
>
> THE COURT: Are there certain requirements for the physical condition for a member of the National Guard?
>
> THE WITNESS: Yes, sir.
>
> THE COURT: What are they?

**2.** 18 U.S.C. § 1001 (1988) provides:
Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

**3.** 18 U.S.C. § 1341 (1988) provides:
Whoever, having devised or intending to devise any scheme or artifice to defraud, or for ob-

taining money or property by means of false or fraudulent pretenses, representations, or promises ... for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

THE WITNESS: They are that the individual be able to—depending upon age. Depending upon the individual's age. They must be able to do a two-mile run, "X" amount of situps, and pushups, depending upon age.

THE COURT: If a person was walking around with a cane, would he be eligible to be a member of the National Guard?

THE WITNESS: They could be, until such time as they were medically evaluated and found not to be militarily fit.

THE COURT: What's your experience as a—

THE WITNESS: My experience is that we have a thing called profiles. When people injure themselves, then we write it—write it up, send them to be evaluated. Then we get the evaluation back and make the determination.

THE COURT: If a person is disabled to the extent that he has to walk around with a cane and has great difficulty walking, would he—could he be a member of the Guard?

THE WITNESS: No, sir. The medical evaluation would stipulate that that individual would have to be medically—would be medically unfit to remain a member of the National Guard.

*Id.* at 37–38.

Upon completion of the trial judge's questioning of Sergeant Thomas, Winstead's attorney asked for leave to inquire further. In response to additional questions on cross-examination, Sergeant Thomas testified that he was not a member of Winstead's unit, did not attend Winstead's drill sessions, had no idea whether Winstead was ever scheduled for a medical evaluation, and had no knowledge of whether Winstead had used a cane at a drill session. *Id.* at 39. As Sergeant Thomas put it, "The only thing I testify is on the documents that are maintained in the Military Personnel Record jacket." *Id.* On redirect, the prosecutor drew information from Sergeant Thomas that Winstead had participated in drill sessions other than those for which his leave and earnings statements showed "no drill performance." *Id.* at 40–41.

## B. The Jury Instructions

Although the specific elements of the two crimes with which Winstead was charged differ, the representations he made to DOL were relevant to both of the charges against him. Therefore, in reviewing the jury instructions, it is helpful to consider not only the portion of the jury instructions to which Winstead objects, but also other excerpts relevant to the jury's deliberations over Winstead's statements to DOL.

When instructing the jury on the mail fraud counts, the trial judge adhered to the language of 18 U.S.C. § 1341 in stating that the Government was required to prove that Winstead "knowingly devised or knowingly participated in a scheme or artifice to defraud or to obtain money by false or fraudulent pretenses, representations or promises as detailed in ... the indictment." Trial Tr. (Nov. 29, 1993) at 66. To further assist the jury, the judge defined "[a] scheme or artifice to defraud or to obtain money or property by means of false or fraudulent pretenses, representations or promises" as "any deliberate plan of action or course of conduct by which someone intends to deceive or to cheat another or by which someone intends to deprive another of something of value." *Id.* at 67–68. He further explained that

[a] false or fraudulent pretense, representation or promise means a statement or an assertion which concerns a material or important fact, or material or important aspect of the matter in question....

A material fact is a fact that would be of importance to a reasonable person in making a decision about a particular matter or transaction.

The term false or fraudulent pretenses, representations or promises ... includes the knowing concealment of facts that are material or important to the matter in question, and that were made or used with the intent to defraud.

*Id.* at 68.

In instructing the jury on the false statement charges, the trial judge indicated that the indictment against Winstead stated that he

knowingly made a false, fictitious or fraudulent statement or representation concerning a material fact or knowingly and willfully made or used a false writing or a

document containing a false, fictitious or fraudulent statement on [sic] entry concerning a material matter within the jurisdiction of a department or agency of the United States, the Department of Labor, for the purpose of obtaining disability benefits....

*Id.* at 69. The judge then instructed the jury that

[i]n order to sustain its burden of proof for the crime of knowingly and willfully making a false statement to the United States Government, or making or using a false writing or document, ... the government must prove the following two essential elements beyond a reasonable doubt to the satisfaction of this jury.

1. That the Defendant ... knowingly made a false[,] fictitious or fraudulent statement or representation to the government, or knowingly made or used a false writing or a document containing a false, fictitious or fraudulent statement as set forth in the indictment.

2. In so doing, the Defendant ... acted willfully.

*Id.* at 70–71. The foregoing instruction said nothing about the jury making its own finding as to whether Winstead's alleged false statements were made to a government agency, and whether those statements were material.[4]

The trial judge also admonished the jury not to "take anything I may have said or done as indicating how I think you should decide this case. If you believe that I have expressed or indicated any opinion as to the facts, well, then you should ignore it. It is your sole and exclusive duty to decide the verdict in this case." *Id.* at 57.

On November 29, 1994, the jury found Winstead guilty of all counts in the indictment.

## C. The Untranscribed Bench Conferences

Due to an apparent mechanical failure in the court reporter's equipment, eight bench conferences could not be transcribed. In an attempt to reconstruct the record, each party submitted a "statement of proceedings" pursuant to Federal Rule of Appellate Procedure 10(c).[5] *See* Appellant's Statement of Proceedings Prepared Pursuant to Fed. R.App.P. 10(c), *reprinted in* App. 36–39; Appellee's Response to Appellant's Statement, *reprinted in* App. 40–43. On June 1, 1995, based upon the parties' statements, the District Court issued findings as to the contents of the untranscribed bench conferences. *See* Dist.Ct.'s Statement of Proceedings Pursuant to Fed.R.App.P. 10(c), *reprinted in* App. 44–46. The court was unable to settle the record with respect to three bench conferences that took place during the former DOL special agent's testimony about her videotaped meeting with Winstead. *See* Trial Tr. (Nov. 24, 1993) at 85, 88, 90.

---

**4.** At the time of Winstead's trial, in late 1993, several circuits, including our own, had held that the issue of materiality should be determined by the court, not the jury. *See United States v. Hansen,* 772 F.2d 940, 950 (D.C.Cir.1985), *cert. denied,* 475 U.S. 1045, 106 S.Ct. 1262, 89 L.Ed.2d 571 (1986). This issue was subsequently clarified in *United States v. Gaudin,* —— U.S. ——, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995), which held that the materiality element of a charge under 18 U.S.C. § 1001 must be submitted to the jury. *Id.* at ——, 115 S.Ct. at 2320.

At Winstead's trial, his counsel questioned whether the element of materiality should be presented to the jury, admitting that she "wasn't able to find cases one way or the other" in the D.C.Circuit, but she had found that other circuits reserved the determination to the judge. Trial Tr. (Nov. 29, 1993) at 27. In response, the judge replied, "in the absence of any authority to the contrary, I supposed [sic] even if there isn't any law directly in point in this circuit, I'd have to go

along with the majority rule, or the rule that was found in other circuits. I'll make the finding of materiality as the Court, which leaves two elements for the jury as I recall." *Id.* at 28. Winstead's counsel voiced no further objection.

**5.** Federal Rule of Appellate Procedure 10(c) provides:

If no report of the evidence or proceedings at a hearing or trial was made, or if a transcript is unavailable, the appellant may prepare a statement of the evidence or proceedings from the best available means, including the appellant's recollection. The statement shall be served on the appellee, who may serve objections or proposed amendments thereto within 10 days after service. Thereupon the statement and any objections or proposed amendments shall be submitted to the district court for settlement and approval and as settled and approved shall be included by the clerk of the district court in the record on appeal.

## II. ANALYSIS

### A. The Court's Questioning of Witnesses

It is beyond cavil that trial judges may question witnesses. *See, e.g., United States v. Spencer,* 25 F.3d 1105, 1109 (D.C.Cir.1994) (citing Federal Rule of Evidence 614(b)). For example, a judge may pose questions designed to address "lines of inquiry opened by one or the other of trial counsel," *United States v. Norris,* 873 F.2d 1519, 1526 (D.C.Cir.), *cert. denied,* 493 U.S. 835, 110 S.Ct. 113, 107 L.Ed.2d 75 (1989), or examine a witness in order to clarify testimony, *Spencer,* 25 F.3d at 1109–10. However, a judge should steer clear of questioning that extends to advocacy. *See Norris,* 873 F.2d at 1526 ("[W]hen the questioning is designed to elicit answers favorable to the prosecution, it is far better for the trial judge to err on the side of abstention from intervention in the case." (internal quotations and alteration omitted)); *United States v. Barbour,* 420 F.2d 1319, 1321 (D.C.Cir.1969) (It is the role of the judge to "remain a disinterested and objective participant in the proceedings, and principles both fundamental and indestructible in our criminal law exhort him to hold to a minimum his questioning of witnesses in a jury trial." (internal quotation and footnote omitted)).

Because Winstead's counsel did not object to the judge's questions at trial, the plain-error standard applies to our review. *United States v. Olano,* 507 U.S. 725, 734–36, 113 S.Ct. 1770, 1778, 123 L.Ed.2d 508 (1993). Thus, the court is to determine " '(1) whether there is unwaived legal error, (2) whether the error is "plain" or "obvious" under current law and (3) whether the error was prejudicial.' " *United States v. Warren,* 42 F.3d 647, 657 (D.C.Cir.1994) (quoting *United States v. Merlos,* 8 F.3d 48, 50 (D.C.Cir. 1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1635, 128 L.Ed.2d 358 (1994)). A prejudicial error is one that "seriously affects the fairness, integrity or public reputation of" the trial. *Olano,* 507 U.S. at 736, 113 S.Ct. at 1779 (internal quotation and alteration omitted).

We need not decide whether the judge's questioning rose to the level of plain or obvious legal error, because it is apparent that the questions did not seriously affect the fairness or integrity of Winstead's trial, as required by the third prong of the plain-error standard. When Winstead's counsel resumed cross-examination after Sergeant Thomas had answered the judge's questions, she elicited admissions that Thomas did not attend Winstead's drill sessions, that he did not know whether or not Winstead was fit for duty, and that his testimony was based on the documents found in Winstead's personnel records. Thus, Winstead's counsel effectively destroyed the significance of Thomas's testimony by demonstrating that the witness had no personal knowledge of Winstead's situation.

In addition, as part of his defense, Winstead presented the testimony of National Guard Sergeant Nathaniel Queen to counter any suggestion that Winstead had faked his disability. Sergeant Queen testified that he was assigned to the same unit as Winstead and that he had seen Winstead with a cane and had never seen him run. Trial Tr. (Nov. 24, 1993) at 108. Sergeant Queen explained that Winstead did not fully participate in physical drills and training due to his disability, but did "as much as he [could]," given his physical limitations. *Id.* Sergeant Queen also confirmed that, generally, individuals must have a physical before they enlist in the National Guard in order to determine whether they are "physically able to actually do the missions or the job required by the ... military occupational skill," *id.* at 110–11, but noted that he did not know if Winstead had a medical examination when he first enlisted, or if he had received a subsequent medical evaluation, *id.* at 112. The prosecutor then elicited a statement from Queen that Winstead used his cane all the time when he came to drills. *Id.*[6]

Finally, the trial judge acted to avert possible prejudice to Winstead's case by instructing the jury to disregard anything that he said that the jurors felt "expressed or indicated any opinion as to the facts" or as to

---

6. Sergeant Queen also responded to a question from the court as to how often National Guard members receive physical examinations, stating that "[p]hysicals are required every two years."

Trial Tr. (Nov. 24, 1993) at 111. There is no serious contention that the court's request for this information prejudiced Winstead's trial.

how the judge thought they should decide the case. Trial Tr. (Nov. 29, 1993) at 57. The combination of this remedial action and the follow-up testimony presented to the jury indicates that the court's questioning of Sergeant Thomas, while arguably ill-advised, does not warrant reversal of Winstead's convictions under the plain-error standard.

### B. *The Jury Instructions on the False Statement Charges*

Winstead claims that the trial court erred in instructing the jury on the false statement charges, as follows: first, the court failed to instruct the jury to consider whether Winstead's statements were material; and, second, the court failed to inform the jurors that they should consider whether any statements found to be false were made within the jurisdiction of a federal agency.

#### 1. The Materiality Issue

■ Had the court entirely failed to present the issue of materiality to the jury, Winstead would have a truly compelling claim for reversal of his false statement convictions. *See United States v. Gaudin,* —— U.S. ——, ——, 115 S.Ct. 2310, 2320, 132 L.Ed.2d 444 (1995) (The Court found that the trial judge's failure to instruct a jury on materiality in a prosecution under 18 U.S.C. § 1001 violated the defendant's constitutional right to have a jury determine "his guilt of every element of the crime with which he is charged."). However, in the instant case, it is clear that the jury was instructed to consider the materiality of appellant's statements before convicting him of the mail fraud charge, so there can be no doubt that the jury would have found those same statements material with respect to the false statement charge. Only one fraudulent scheme was at issue with respect to both charges, so the court's instruction to the jury that materiality was an element of the mail fraud charge ensured that that element would have been found with respect to the false statement charge had the jury been properly instructed. Also, in light of the jury's consideration of materiality as to the mail fraud charge, it cannot be said that the jury had no occasion to address the issue of materiality. In short, this case is unlike *Gaudin,* in which there was nothing to indicate that the jury considered the element of materiality.

In the instant case, there is no question that the jury must have found that Winstead made false, fictitious, or fraudulent statements or representations, because it found Winstead guilty of several violations of 18 U.S.C. § 1001. Those same representations (and their falsity) were also the basis for the mail fraud charges, of which the jury also found Winstead guilty; these latter findings, and the jury instructions related to them, make it clear that the jury would have found that the misrepresentations were material for purposes of both 18 U.S.C. § 1341 and 18 U.S.C. § 1001 had the jury been properly instructed as to both charges.

In advising the jury on the mail fraud charges, the court stated that 18 U.S.C. § 1341 required a finding that Winstead knowingly devised or participated in "a scheme or artifice to defraud or to obtain money by false or fraudulent pretenses, representations or promises." Trial Tr. (Nov. 29, 1993) at 66. Then, this entire phrase was defined as "any deliberate plan of action or course of conduct by which someone intends to deceive or to cheat another or by which someone intends to deprive another of something of value." *Id.* at 67–68. The concept of "false or fraudulent pretense, representation or promise" was further defined as "a statement or an assertion which concerns a *material* or *important* fact or *material* or *important* aspect of the matter in question." *Id.* at 68 (emphasis added). The concept of "*material* fact" was explained as "a fact that would be of importance to a reasonable person in making a decision about a particular matter or transaction." *Id.* (emphasis added).

Upon finding that Winstead had made false statements or representations proscribed by 18 U.S.C. § 1001, the jury undoubtedly considered whether those same statements were false in making its decision about whether Winstead violated 18 U.S.C. § 1341. The instructions from the trial court clearly informed the jury that, by definition, a false or fraudulent pretense or representation for purposes of 18 U.S.C. § 1341 must concern a material or important fact or matter. Thus, in convicting Winstead of mail fraud, the jury should have found that Win-

stead's statements were material, and it is beyond doubt that the members of the jury would have reached the same conclusion had they explicitly considered materiality as part of their deliberations on the 18 U.S.C. § 1001 charges.

■ We reject Winstead's contention, based on a rigid literal parsing of the jury instructions, that the jury did not necessarily have to consider materiality in finding him guilty of mail fraud. Arguably, the cumbersome structure of the jury instructions makes it theoretically possible that, without considering materiality, the jury could have found that Winstead's statements to DOL constituted "a scheme or artifice to defraud" by virtue of a "deliberate plan of action or course of conduct by which [Winstead] intend[ed] to deceive or to cheat another." We think it essentially inconceivable that the jury could have found guilt on the mail fraud counts without finding materially false statements. It could have done so only by focussing on the brief reference to a "scheme or artifice to defraud," to the complete disregard of the lengthy exposition relating to false representations, a skewing of focus that seems peculiarly unlikely in light of the fact that the 18 U.S.C. § 1001 charge directed the jurors precisely to the issue of false statements.

### 2. The Jurisdictional Issue

■ Winstead also claims that the trial court erred in failing to instruct the jury that it must determine whether his false statements arose in connection with a "matter within the jurisdiction of any department or agency of the United States." 18 U.S.C. § 1001 (1988). However, even assuming that the jurisdictional element should have been presented to the jury, Winstead cannot prevail because the issue was not raised below and, under the plain-error standard, the trial court's failure to allow the jury to decide the jurisdictional issue did not prejudice Winstead's trial.

The jury was clearly informed that the statements under consideration were made to DOL. Furthermore, there is no question that 18 U.S.C. § 1001 proscribes the making of material false statements to DOL. Thus, even if the judge erred in failing to submit the jurisdictional element to the jury, this failure did not affect the fairness or integrity of Winstead's trial in any meaningful sense, and thus did not rise to the level of plain error.

### C. The Missing Transcripts

[8–10] The Court Reporters Act, 28 U.S.C. § 753(b) (1994), requires that court reporters attend at "[e]ach session of the court" and record verbatim "all proceedings in criminal cases had in open court." This requirement applies to bench conferences. E.g., United States v. Robinson, 459 F.2d 1164, 1170 (D.C.Cir.1972) (per curiam). "While recording proceedings in criminal cases is mandatory, this court has joined all other circuits that have addressed the issue in holding that the reporter's failure to record, or to make a full transcript available to the defendant, does not per se require reversal." United States v. Carrazana, 70 F.3d 1339, 1342 (D.C.Cir.1995) (citing cases). Rather, we weigh the burdens and benefits of reversing a conviction due to an incomplete transcript on a case-by-case basis. Id. The factors the court has generally considered are: "(1) the goal of deterring violations of the Court Reporter Act; (2) the ability (and reasonable efforts of the parties) to correct for violations of the Act by reconstructing the record; and (3) the likelihood that reversible error occurred." Id.

■ In this case, there would be no deterrent value in reversing Winstead's convictions. Both sides agree that the failure to record certain bench conferences apparently was due to an inadvertent equipment malfunction. There is also no dispute that a few of the bench conferences simply could not be reconstructed despite the best efforts of the parties and the court. The most important factor here, however, is the lack of any likelihood that reversible error occurred during those few untranscribed bench conferences. As in Carrazana, "only a relatively small portion of the transcript is missing; the vast majority of the proceedings are available to counsel." Id. at 1343. In addition, the missing portions do not appear to be particularly significant. Although a bench conference

"might be the occasion of a critical ruling, its omission from the record is significant only to the extent that the omission may conceal the presence of some error in what actually reached the jury." *Id.*

In this case, the missing bench conferences appear to have addressed only the testimony of one witness, the DOL special agent; and, as the Government points out, the context of these bench conferences indicates that no errors would have been likely to have occurred. The transcript of the trial proceedings, which is complete, indicates that the bench conferences for which transcripts are missing most probably dealt with either general trial "housekeeping," as the Government calls it, or issues of whether and how certain items could be used to refresh the memory of the testifying witness. *See* Trial Tr. (Nov. 24, 1993) at 85–90. Therefore, it is unlikely that reversible error occurred during these conferences, and appellant cites nothing to give us pause. In particular, we note that Winstead has made no claim that he suffered any specific prejudice because of the missing transcripts. Although this court would not necessarily require such an allegation, a defendant's "failure to allege specific prejudice is indeed an important factor" in the consideration of whether prejudicial error is likely to be lurking in the untranscribed portion of the proceedings. *Carrazana,* 70 F.3d at 1343.

### III. Conclusion

For the reasons set forth above, we affirm appellant's convictions.

*So ordered.*