UNITED STATES of America, Appellee,

v.

Anthony J. GANTT, a/k/a Fats, Appellant.

No. 97–3053.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 16, 1998.

Decided March 10, 1998

Released April 7, 1998.

Rehearing Denied June 11, 1998.

William B. Moffitt argued the cause and filed the briefs for appellant.

John L. Brownlee, Assistant U.S. Attorney, argued the cause for appellee, with whom Mary Lou Leary, U.S. Attorney at the time the brief was filed, John R. Fisher, Thomas C. Black and William J. O'Malley, Assistant U.S. Attorneys, were on the brief.

John L. Brownlee, Assistant U.S. Attorney, argued the cause for appellee, with whom Mary Lou Leary, U.S. Attorney at the time the brief was filed, John R. Fisher, Thomas C. Black and William J. O'Malley, Assistant U.S. Attorneys, were on the brief.

Before: EDWARDS, Chief Judge, WALD and ROGERS, Circuit Judges.

Opinion for the Court filed by Chief Judge EDWARDS.

EDWARDS, Chief Judge:

In February 1997, a jury convicted Anthony J. Gantt ("appellant" or "defendant") of two criminal counts related to the possession and distribution of cocaine. Gantt's representation prior to and during trial was marked by confusion. In the weeks leading up to the trial, he grew dissatisfied with the performance of his attorney, (hereinafter "Attorney X"), and Attorney X withdrew from the case in favor of another attorney. It was then discovered that Attorney X, during the time he represented Gantt, simultaneously represented another man (hereinafter "John Doe") who—apparently without Attorney X's knowledge—had been questioned by prosecutors in connection with

Gantt's case. Meanwhile, Gantt's new attorney moved to continue the trial for 30 days, because he needed to rethink his trial strategy after learning that Gantt had made incriminating statements during a "debriefing" session with the Government earlier in the proceedings. The District Court granted a two-day continuance.

Gantt now raises three challenges to his conviction, claiming that: (1) Attorney X rendered ineffective assistance because of a conflict of interest; (2) the District Court erred in refusing the 30–day continuance; and, (3) the District Court erred by allowing the jury to see, during deliberations, only two one-hour videotapes that had been shown during trial, rather than the full 72 hours of videotapes that were submitted into evidence. Although the handling of this case by counsel left something to be desired, we can discern no reversible error by the District Court. Accordingly, appellant's conviction is affirmed.

## I. BACKGROUND

### A. The Offense

The offense leading to the trial in this case occurred on February 1, 1995. The evidence offered by the Government to prove the offense was largely uncontested, because appellant presented no testimony at trial. The facts were as follows.

On February 1, 1995, Gantt and another man, Olden Minnick, drove to a retail store located in the Northwest section of the District of Columbia. At the time, the store was subject to extensive electronic and physical surveillance by agents of the Drug Enforcement Administration ("DEA agents"). After Gantt and Minnick parked and entered the store, a DEA agent established that the car in which Minnick and Gantt arrived was registered to Minnick. Gantt and Minnick eventually emerged from the store, with Gantt carrying a white plastic bag. The two got in the car and drove away, with Minnick at the wheel. DEA agents followed and called for additional help.

The car carrying Minnick and Gantt stopped at a traffic light near 16th Street and Columbia Road, and officers from the Metro-

politan Police Department quickly pulled in front of and behind the car. An officer who approached the passenger side of the car saw Gantt sit upright and stare straight ahead. When the officer shined his flashlight on Gantt and tapped the window, Gantt did not respond. Another officer approached the driver's side of the car. Both officers then heard the automatic door locks "click" down. After apparent communication between Minnick and Gantt, the car drove over a concrete island and sped away. During the ensuing chase by the police, Minnick threw a bag containing several blocks of cocaine out of the driver's side window. Minnick and Gantt succeeded in evading the police. The police did not arrest Gantt until November 5, 1996, at which time he was charged with conspiracy to distribute more than 500 grams of cocaine in violation of 21 U.S.C. § 846, and possession with the intent to distribute more than 500 grams of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(ii).

## B. *Pre–Trial Proceedings*

The facts pertaining to the pre-trial proceedings implicating Gantt were not in dispute before the District Court, *see* Hearing Tr. (4/25/97) at 56–57 (adopting chronology of events set forth in Government's Opposition To Defendant's Motion For a New Trial, Crim. No. 96–317–02(JR) (filed Apr. 24, 1997) ("Government's April 1997 Motion")), and for the most part are not in dispute on appeal. The undisputed record shows that John Doe, who was represented by Attorney X, was questioned by prosecutors about the Gantt case in the spring or summer of 1996. Subsequently, Doe signed a plea agreement in connection with charges then pending against him; he was then called to testify before a grand jury. Attorney X was unaware that Doe had been questioned by prosecutors about the Gantt matter.

Following an indictment filed on September 17, 1996, police officers arrested Gantt on November 5, 1996. At Gantt's presentment, a colleague of Attorney X appeared on behalf of the defendant, stating that he was standing in for Attorney X. Assistant United States Attorney ("AUSA") Richard Edwards, who had been handling the investigation of the events that took place on February 1, 1995 (hereinafter "February 1995 incident"), attended the presentment. However, Edwards failed to recognize—as did apparently every other AUSA who had contact with Doe and Gantt—that a potential conflict of interest resulted from Attorney X's simultaneous representation of Doe and Gantt.

The parties provide conflicting accounts as to when Attorney X entered his first formal appearance on behalf of Gantt. According to Gantt, Attorney X appeared at a status conference on November 25, 1996, at which trial was set for February 3, 1997. *See* Appellant's Br. at 7. According to the Government, Attorney X first appeared at a status conference on January 3, 1997, at which the February trial date was confirmed. *See* Government Br. at 9; Government's April 1997 Motion, at 5. Attorney X claims that he saw Gantt at the D.C. Jail during the week of November 16–22, 1996, "to finalize representation arrangements as well as to advise defendant of the best legal course of action to take." Ex Parte Motion for CJA Appointment, Crim. No.96–317–02(JRR) (filed Jan. 22, 1997), at 2. Following his discussions with Gantt, Attorney X says that he arranged for defendant to be debriefed and had a second colleague accompany Gantt to the debriefing. *See id.*

In any event, the parties apparently agree that the second colleague of Attorney X represented Gantt at a status hearing on November 15, 1996. Around that time, the second colleague told AUSA Edwards that Gantt was interested in pleading guilty in the case and cooperating with the Government. Subsequently, on November 27, 1996, the second colleague and Gantt attended a Government debriefing, where Gantt, after signing a letter stating that his remarks could be introduced at trial for cross-examination purposes, discussed the February 1995 incident and spoke of other drug dealers in the area and of the assistance he could provide. AUSA Edwards was not present at the November 27 debriefing.

With the second colleague still representing Gantt, the parties reached a tentative arrangement to enter into a plea agreement. However, at the request of Attorney X,

AUSA Edwards did not seek actual entry of the plea until after January 1, 1997. The court released Gantt on personal recognizance on December 11.

As it turned out, Gantt never entered a guilty plea. During the three weeks after the January 3, 1997, status conference, Gantt, by his own account, "became dissatisfied" with Attorney X and sought the services of another lawyer, Antoini Jones. Appellant's Br. at 3, 8. During the week of January 12, 1997, Attorney X informed AUSA Edwards that he was going to withdraw from the case in favor of Jones. On January 22, 1991, Attorney X moved to withdraw as Gantt's counsel "based upon irreconcilable differences," stating that defendant had "refused counsel's advice concerning a plea offer made by the government." Motion to Withdraw as Counsel of Record, Crim. No. 96–317–02(JRR) ("Motion to Withdraw"). At a hearing held the same day, Jones entered an appearance on behalf of Gantt and informed the court that he was replacing Attorney X. At that hearing, Jones informed the court that he would be ready for trial on February 3, 1997. *See* Hearing Tr. (1/31/97) at 2.

On January 27, 1997, Attorney X sent a letter to AUSA Edwards stating that he had just learned of Doe's involvement in the case. Attorney X stated that no one from the United States Attorney's Office had told him that Doe had been questioned in connection with Gantt's case, and that he had just learned of it a few days earlier when Doe himself told him for the first time. Attorney X further stated that he had never been present during any debriefing of Doe where Gantt was discussed, nor did he know that Doe had been called to testify before a grand jury. Attorney X asserted that he was unaware of the conflict issue at the time he was advising Gantt concerning the plea offer and trial options.

On January 31, 1996, Jones moved for a 30–day continuance because he had just learned of Gantt's debriefing by the Government on November 27, 1996. Jones claimed that he would now have to "regroup and come up with another trial strategy." Hearing Tr. (1/31/97) at 5–6. The District Court, noting that moving back the trial date would cause substantial scheduling problems, granted Gantt a two-day continuance. *See id.* at 13–14.

### C. Trial and Post–Trial Proceedings

On February 5, 1997, a jury trial commenced. The Government's evidence included four video tapes from surveillance of the store involved in the February 1995 incident; testimony from DEA agents and from police officers who stopped and approached the car allegedly carrying Minnick and Gantt before it sped away; and fingerprint evidence gathered from the wrapping of the package that was thrown from the car during the chase. During the course of the trial, after an evidentiary hearing, the trial judge denied Gantt's motion *in limine* asking the Court to exclude for impeachment purposes all statements by Gantt during his debriefing. Gantt then decided not to testify. Gantt's attorney waived opening statement and offered no evidence on behalf of Gantt. The jury convicted Gantt on February 7, 1997.

Gantt moved for a new trial, contending, *inter alia*, that Attorney X's simultaneous representation of Doe and Gantt before Jones took over Gantt's case violated the latter's right to a fair trial. On April 25, 1997, the District Court denied Gantt's motion for a new trial and sentenced him to a prison term of 135 months, an eight year period of supervised release, and a one hundred dollar special assessment. This appeal followed.

## II. ANALYSIS

### A. The Conflict of Interest Challenge

 Gantt argues on appeal, as he did to the District Court in his motion for a new trial, that he received ineffective assistance of counsel in violation of the Sixth Amendment as a result of Attorney X's simultaneous representation of both Doe and appellant. Because Doe was questioned by prosecutors about the Gantt case, appellant argues that Attorney X had a conflict of interest that caused him to be ineffective in rendering pre-trial advice to Gantt. Appellant's counsel observes in this regard that,

"[d]uring this time period, [Attorney X] arranged to have Mr. Gantt waive his Fifth Amendment rights, make self-incriminating statements, and attempted to convince Mr. Gantt to plead guilty." Appellant's Br. at 24.

A criminal defendant succeeds on an ineffective assistance of counsel claim under the Sixth Amendment if he shows that "an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan,* 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980). A defense attorney has an "actual conflict" when he is "required to make a choice advancing [another client's] interests to the detriment of his client's interest." *United States v. Bruce,* 89 F.3d 886, 893 (D.C.Cir.1996) (internal quotation omitted); *see also United States v. Thomas,* 114 F.3d 228, 252 (D.C.Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 635, 139 L.Ed.2d 614 (1997). By making the required showing under *Cuyler,* a defendant avoids the more stringent two-part test for ineffective assistance set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), which requires proof "(1) that counsel's performance was deficient, falling 'below an objective standard of reasonableness,' and (2) that the deficient performance prejudiced the defendant, depriving him of a fair trial." *Bruce,* 89 F.3d at 893 (quoting *Strickland,* 466 U.S. at 687, 688, 104 S.Ct. at 2064, 2064–65). Where a defendant meets the *Cuyler* test, prejudice is presumed. *See Strickland,* 466 U.S. at 692, 104 S.Ct. at 2067; *Thomas,* 114 F.3d at 252.

Gantt cannot succeed under *Cuyler* for the simple reason that Attorney X, during his representation of appellant, did not know that prosecutors had questioned Doe about the Gantt case. In other words, no "actual conflict" existed. The chronology of pre-trial proceedings provided by the Government, and relied upon by the District Court without challenge from appellant, *see* Hearing Tr. (4/25/97) at 56–57, shows that Attorney X never knowingly chose between advancing Doe's interests and advancing those of Gantt. It was only after Attorney X ceased his representation of Gantt that Doe informed Attorney X that he had been questioned

about Gantt's case. Government's counsel—most notably AUSA Edwards—failed to make the connection that Attorney X represented both Doe and Gantt until Attorney X wrote to him with that information. Thus, even if Attorney X advised Gantt to be debriefed by the Government or plead guilty, he did so without knowing of any possible connection between Gantt and Doe. Under these circumstances, Attorney X did not face an "actual conflict," so he did not render ineffective assistance on that ground. *See United States v. Hopkins,* 43 F.3d at 1116, 1117 (6th Cir.1995) ("A conflict is hypothetical where, as here, the attorney does not in fact know of the conflict from the dual representation.").

Furthermore, on the record at hand, Gantt cannot show that any alleged conflict "adversely affected" Attorney X's performance. That element of the *Cuyler* test requires Gantt to demonstrate that the conflict had "some negative effect upon his defense (defined as 'an actual lapse in representation')." *United States v. Shark,* 51 F.3d 1072, 1076 (D.C.Cir.1995) (quoting *Cuyler,* 446 U.S. at 349–50, 100 S.Ct. at 1718–19). Here, appellant makes no serious argument that Attorney X (or any other attorneys in his place) would have acted differently on Gantt's behalf had he (or they) known about Doe's involvement at an earlier stage in the proceedings. In other words, appellant fails to articulate a strategy that would have been employed by a defense counsel upon learning of Doe's involvement that was not followed in this case.

Gantt contends that, "had Mr. [Attorney X] promptly notified the district court of his conflict, the district court would have had no choice but to remove him as Mr. Gantt's counsel due to the conflict." Appellant's Br. at 29. Appellant does not make clear the implications of this hypothesis. Surely, the mere fact that another attorney would have taken over the case does not demonstrate that Attorney X was deficient in representing Gantt. We might take appellant to mean that another attorney in place of Attorney X would have advised Gantt to forgo the debriefings with the Government. However, we are at a loss to understand why this

would have been viewed as a good strategy. Presumably, if Gantt had declined to meet with the Government in November 1996, he would have been free to testify on his own behalf without fear of impeachment from the debriefing materials. However, it is uncontested that the Government's affirmative case against Gantt, based upon testimony of officers, fingerprint evidence, and videotapes of the store, would have remained formidable. Indeed, Gantt suggests nothing that he or other witnesses might-have said to refute or diminish the prosecution's case.

Moreover, during the hearing held on April 25, 1997, on defendant's motion for a new trial, the District Court found it "very clear" from testimony provided by Attorney X that, before Gantt's debriefing, the defendant was primarily concerned with obtaining his release from detention prior to the Christmas holiday and with avoiding incarceration for the charged offenses. Hearing Tr. (4/25/97) at 53–54. Thus, it is unsurprising that Gantt, even in hindsight, fails to articulate a reason why Attorney X's advice that he cooperate with the Government would have been unsound, even if the fact of Doe's conversations with the Government had been known to Attorney X or another attorney in his stead. Assuming, *arguendo,* that another attorney *might* have advised Gantt differently, the mere possibility that appellant would have refused a debriefing in these hypothetical circumstances does not, by itself, demonstrate that there was a "lapse of representation" in the instant case.

To further support his contention that Gantt suffered adverse effects from Attorney X's conflict, Gantt argues that Attorney X's actions in Gantt's case were "strongly, if not solely, motivated by his ability to collect a fee.... [A]s far as his ability to earn a fee, the most expedient course of action for [Attorney X] was exactly what took place in the instant case—allow the conflict to remain undisclosed and advise Mr. Gantt to enter into a plea agreement so that there will be no trial." Appellant's Br. at 29. This allegation is either (1) an implicit assertion that Attorney X actually knew of the conflict, which he failed to disclose so that he could increase his fee, or (2) an alternative theory of an "actual

conflict"—*i.e.,* that Attorney X was forced to choose between advancing his own pecuniary interests and mounting an effective defense on behalf of Gantt. Neither claim demonstrates an actual lapse in representation, because neither explains why Gantt should not have agreed to the debriefing.

Furthermore, Gantt did not argue to the District Court, nor does he make a serious argument in his briefs on appeal, that Attorney X actually knew at some earlier stage about Doe's involvement. Gantt presents no evidence that Attorney X failed to disclose any knowledge of the conflict in order to maximize his fee. Thus, we reject as unsupported the suggestion that Attorney X knew of Doe's activities at the same time that he represented Gantt, and that Attorney X intentionally delayed informing the other parties of this information until after his representation of Gantt had ended.

We also reject the suggestion that Attorney X's desire to maximize his fees itself constituted an "actual conflict." As a theoretical matter, it is possible for a conflict to arise when a criminal defendant's interests are adverse to his or her lawyer's pecuniary interests. *See Daniels v. United States,* 54 F.3d 290, 294–95 (7th Cir.1995) (remanding for evidentiary hearing on defendant's claim that lawyer pressured defendant into accepting plea); *Winkler v. Keane,* 7 F.3d 304, 307–08 (2d Cir.1993) (concluding that contingency fee created an actual conflict of interest for trial counsel). But the claim that Attorney X attempted to maximize his fee by encouraging Gantt to plead guilty makes no sense, because Attorney X presumably would have earned a larger fee if, rather than entering a guilty plea, Gantt had decided to proceed with a trial with Attorney X as his counsel. Gantt offers nothing to contradict the obvious.

In sum, Gantt's claim of ineffective assistance fails under the *Cuyler* test, because there is no showing of an actual conflict, nor is there any showing that any alleged conflict adversely affected Attorney X's performance.

**B.** *The Challenge to the Denial of 30–Day Continuance*

■ Gantt also argues that the District Court committed reversible error in granting

him only a two-day continuance for the start of his trial, from February 3, 1997, to February 5, rather than the requested 30–day continuance. Attorney Jones filed the motion for the continuance on January 31, 1997—three days before the scheduled start of appellant's trial—claiming that he needed the extra time to obtain an expert witness and "prepare an adequate defense." Motion for Continuance, Crim. No. 96317–02(JRR) (filed Jan. 31, 1997) ("Continuance Motion"). Jones noted in the motion that he had not received Gantt's files from Attorney X until January 27, 1997, at which time Jones was engaged in a trial in an unrelated case. *See id.* Jones further noted that on January 29, 1997, he was advised by Government counsel of "crucial information that would have a major impact on defendant's trial strategy," *id.*—that is, that Gantt had made incriminating statements in the debriefing. In granting only a two-day continuance, the District Court explained that it simply did not have another opening on its calendar within the next 90 days.

■ The Supreme Court has made clear that "[n]ot every restriction on counsel's time or opportunity to investigate or to consult with his client or otherwise to prepare for trial violates a defendant's Sixth Amendment right to counsel[,]" as "judges necessarily require a great deal of latitude in scheduling trials." *Morris v. Slappy,* 461 U.S. 1, 11, 103 S.Ct. 1610, 1616, 75 L.Ed.2d 610 (1983). In short, "[a] trial judge enjoys great discretion in ruling on a motion for a continuance," and such rulings are reviewed only to determine "whether the judge clearly abused his discretion." *United States v. Poston,* 902 F.2d 90, 96 (D.C.Cir.1990). Among the factors to be weighed by a court in considering a motion for a continuance are:

the length of the requested delay; whether other continuances have been requested and granted; the balanced convenience or inconvenience to the litigants, witnesses, counsel, and the court; whether the requested delay is for legitimate reasons, or whether it is dilatory, purposeful, or contrived; whether the defendant contributed to the circumstance which gives rise to the request for a continuance; whether the

defendant has other competent counsel prepared to try the case, including the consideration of whether the other counsel was retained as lead or associate counsel; [and] whether denying the continuance will result in identifiable prejudice to defendant's case, and if so, whether this prejudice is of a material or substantial nature.

*United States v. Burton,* 584 F.2d 485, 490–91 (D.C.Cir.1978) (footnotes omitted); *see also Poston,* 902 F.2d at 97. In deciding whether the District Court abused its discretion in denying a request for a continuance, the appellate court must assess "the reasons presented to the trial judge at the time the request is denied," *Ungar v. Sarafite,* 376 U.S. 575, 589, 84 S.Ct. 841, 850, 11 L.Ed.2d 921 (1964), and remain mindful that trial judges necessarily require great latitude in scheduling trials.

■ On the record before us, we conclude that the District Court acted within its discretion in denying the request for a 30–day continuance. Gantt's second defense counsel told the Court when he took over the case on January 22, 1997, that he was ready to go to trial. Thus, it was not unreasonable for the trial judge to view with skepticism the reasons proffered by defense counsel for the 30–day continuance. Moreover, the District Court indicated it would have been greatly inconvenienced by the long continuance, in part because the Court had relied upon defense counsel's statement of readiness when the Court approved Jones' replacement of Attorney X in the case. *See* Hearing Tr. (1/31/97) at 2, 13. Furthermore, the trial court knew that Attorney X "had complete discovery" when he moved to withdraw as counsel; that Attorney X indicated that, if necessary, he would be prepared to go to trial on the original date; and that all of Attorney X's files and discovery were available to Jones. Motion to Withdraw, at 2. Although the Court's concern about its docket is not dispositive of the question of whether to grant a continuance, *see Ungar v. Sarafite,* 376 U.S. at 589, 84 S.Ct. at 849–50, the trial judge could legitimately question the reasons for delay proffered by defense counsel in light of counsel's earlier attestations of readiness.

It is also noteworthy that Gantt's defense counsel made no specific proffer justifying a need for more time. Counsel suggested that his primary motivation for seeking the continuance was his finding out about the incriminating statements made by Gantt during the November 27, 1997, debriefing, which he claimed "totally destroy[ed] the trial strategy [he] had prepared." Hearing Tr. (1/31/97) at 5. However, counsel did not articulate to the District Court, nor does he demonstrate on appeal, any "identifiable prejudice" that is "material or substantial [in] nature," *Burton*, 584 F.2d at 491, resulting from the denial of the continuance. Defense counsel effectively conceded to the District Court that the "problem" posed by the debriefing would not "get any better" with the passage of a month. Hearing Tr. (1/31/97) at 5. Defense counsel filed a motion *in limine* just before trial, seeking to prevent the use of the debriefing statements for purposes of impeachment during the trial, but Gantt does not now argue that the District Court erred in denying the motion and allowing the Government to use the debriefing material, nor does Gantt explain how the motion *in limine* could have improved with time. Moreover, as discussed above, Gantt makes no serious argument that he would have declined to engage in the debriefing session had it been known at the time that Doe had been questioned by prosecutors.

■ Other arguments by Gantt similarly fail to show prejudice resulting from the District Court's denial of the 30–day continuance. In claiming in his motion for a continuance that he wanted time to "obtain the needed expert," Continuance Motion, defense counsel presumably was referring to his desire to obtain a witness in order to challenge the Government's fingerprint evidence. Gantt has renewed this argument on appeal, asserting that the Government's fingerprint expert found only 13 points of comparison between defendant's prints and prints recovered by the Government in connection with the February 1995 incident, where the average fingerprint has between 75 and 150 comparable characteristics. *See* Appellant's Br. at 10–11; Reply Br. at 5. However, at no point in the proceedings has appellant expressly claimed that an expert witness, in

light of these facts, would testify that the Government's fingerprint evidence was unreliable. Thus, Gantt's claim that the Government's fingerprint evidence could have been rebutted remains entirely speculative. *See Poston*, 902 F.2d at 98 ("Mere assertions regarding the utility of prospective testimony do not provide a sufficient basis to compel a continuance" where there is no indication that the "testimony would have been material and favorable."). In any event, Gantt's attack on such evidence does not account for other evidence—such as videotape evidence—demonstrating his involvement in a conspiracy, and the fact that the drugs were tossed from Minnick's car during the chase.

■ Gantt also makes passing reference on appeal, as he did before the District Court, to the trial counsel's need for time to "interview a government witness" prior to trial. Appellant's Br. at 21; *see also* Hearing Tr. (1/31/97) at 13. This argument is unconvincing, given that Jones did not articulate at the pretrial hearing what witness he sought to interview and what his line of inquiry would be. *See Poston*, 902 F.2d at 98. Gantt's complaint that Jones was unable to review all of the Government's exhibits before trial, *see* Appellant's Br. at 22–23; Reply Br. at 6, is likewise vague and conclusory. Although the Government does not dispute that it waited until January 30, 1997, to disclose certain evidence obtained from electronic surveillance, and to request further fingerprinting of Gantt, *see* Continuance Motion, Gantt provides no persuasive argument that this burden was significant in the context of the trial.

■ Gantt's counsel makes one last argument in support of Gantt's contention that he was wrongly denied a 30–day continuance. At oral argument, defense counsel urged that, if the District Court had found out about Attorney X's potential conflict before trial, the Court would have granted a longer continuance to whomever took over Gantt's case. Thus, the argument goes, it would be unfair to deny Gantt a new trial simply because the trial judge did not have access to all relevant information at the time the judge denied the longer continuance. Indeed, we

do not know whether the District Court would have been more sympathetic to Jones' request for a continuance if it knew that Attorney X had a conflict in the case. Nevertheless, the possibility that the Court would have acted differently under these circumstances does not demonstrate that extra time would have materially benefitted appellant. When all is said and done, we can discern no prejudice resulting from the District Court's denial of the continuance.

## C. Challenge to District Court's Response to Jury's·Video Request

 Gantt's final challenge to his conviction is his claim that the District Court committed reversible error by allowing the jury to view only two one-hour video tapes introduced into evidence by the Government. At trial, the Government introduced 72 hours of video tapes—exhibits number 31 and 29—which were taken, in part, on the evening of February 1, 1995, of the front door and window of the store visited by Gantt and Minnick. See Trial Tr. (2/5/97) at 182. Later, the Government introduced two "one-hour segments from the 72–hours"—exhibits 30 and 32. Id. at 374. The Government played the shorter tapes, exhibits 30 and 32, for the jury during trial, see id. at 383, but did not play the longer tapes. After the parties' closing arguments, the trial judge told the jury that for technical reasons it would not have access to any of the video tapes during deliberations unless the jury made a special request. During the deliberations, the Court received a note from the jury that said: "May we please see the video on the small T.V." Trial Tr. (2/7/97) at 448. The trial judge then made arrangements for the jury to view only the two one-hour video tapes, stating that he did not want the jury "getting into the 72–hour versions." Id. at 454.

 Because Gantt's counsel did not object to the District Court's arrangements for the video tapes at trial, we review for plain error. See United States v. Olano, 507 U.S. 725, 733–36, 113 S.Ct. 1770, 1777–79, 123 L.Ed.2d 508 (1993). Under this standard, "the court is to determine: '(1) whether there is unwaived legal error, (2) whether the error is "plain" or "obvious" under current law and (3) whether the error was prejudicial.'" United States v. Winstead, 74 F.3d 1313, 1319 (D.C.Cir.1996) (quoting United States v. Warren, 42 F.3d 647, 657 (D.C.Cir.1994)). We also inquire whether the alleged error "seriously affects the fairness, integrity or public reputation of judicial proceedings." Olano, 507 U.S. at 736, 113 S.Ct. at 1779 (internal quotation omitted).

Gantt argues that the District Court's decision with regard to the tapes usurped the jury's role as fact-finder and thereby deprived appellant of his Constitutional right to trial by jury. We disagree. The District Court's decision was neither surprising nor problematic given the circumstances in which the jury made its request: the jury saw only the shorter tapes at trial; the shorter tapes were condensed from the longer tapes; and the jury asked only that it "see the video." In this situation, there was no requirement that the District Court give the jury the longer tapes. Had an objection been raised and an issue framed, suggesting either that the trial judge had misunderstood or ignored the jury's request for the longer tapes, or that the jury would be misled by viewing only the shorter tapes, then a different question would be posed. But no such question has been raised. Indeed, Gantt can point to no prejudice that he suffered because of the jury's failure to view the longer tapes. In short, nothing that the trial judge did amounted to error, much less "plain error."

## III. Conclusion

For the foregoing reasons, appellant's conviction is affirmed.