# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

Argued September 10, 2015      Decided February 5, 2016

No. 14-3074

UNITED STATES OF AMERICA,
APPELLEE

v.

SYLVAN D. ABNEY,
APPELLANT

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:07-cr-00191-1)

---

*Rachel Murphy* argued the cause for appellant. With her on the briefs were *Brent Gurney* and *Emily Stark*.

*Jay Apperson*, Assistant U.S. Attorney, argued the cause for appellee. On the brief were *Vincent H. Cohen Jr.*, Acting U.S. Attorney, and *Elizabeth Trosman*, *Elizabeth H. Danello*, and *David B. Goodhand*, Assistant U.S. Attorneys.

Before: ROGERS, BROWN and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

Dissenting opinion filed by *Circuit Judge* BROWN.

ROGERS, *Circuit Judge*: In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court identified the two-prong objective test for determining whether a defendant's constitutional right to the effective assistance of counsel has been violated. Today that question arises in the context of a sentencing for possession of 68 grams of crack cocaine that occurred five days after Congress passed the Fair Sentencing Act ("FSA"), when Presidential approval was imminent and virtually assured. Despite knowing that when the FSA was signed by the President, the mandatory minimum sentence for his client's offense would be cut in half, from 10 years to five years, Sylvan D. Abney's then-counsel failed to seek a continuance of sentencing.

At the time of Abney's scheduled sentencing it was an open question whether the reductions in the FSA would apply to pre-FSA conduct where the defendant was sentenced after the FSA took effect. Yet, as cases in this and other circuits indicate, the defense Bar was seeking continuances of scheduled sentencings until the FSA became law. That is because it was at least reasonably probable — if not more likely still — that courts would interpret the FSA's new mandatory minimums to apply to defendants sentenced after its effective date. In 1984, the Sentencing Reform Act established that the applicable Sentencing Guidelines are those in effect at the time of sentencing, not those in effect at the time of the offense. The FSA did not change this scheme. Rather, it amended the Controlled Substances Act to reduce the disparity between the amounts of crack cocaine and powder cocaine that trigger mandatory minimum sentences. It also directed the United States Sentencing Commission to issue new Sentencing Guidelines consistent with the FSA as soon as practicable and in no event later than 90 days after the FSA's enactment. Any competent criminal defense attorney familiar with federal sentencing principles would have understood that courts were

reasonably likely to read the FSA's lower mandatory minimums to apply to defendants sentenced after its enactment. The contrary interpretation of the FSA would impute to Congress an unusual intent: A defendant sentenced for a crack-trafficking offense after the FSA became law would receive the benefit of a lower Sentencing Guidelines range based on the reduced crack-powder disparity, while at the same time that defendant would be subject to mandatory minimums based on the broad crack-powder disparity the FSA was meant to narrow.

A continuance would have placed Abney in a position to benefit from the reduced mandatory minimum were the interpretation of the FSA favorable to him to prevail. Moreover, a continuance posed no risk to the public because Abney was incarcerated pending sentencing. We hold that under *Strickland*'s two-prong test counsel's failure to seek a continuance of Abney's sentencing was, in the absence of any informed strategic choice, objectively unreasonable, and it also was prejudicial because, but for counsel's failure, there was a reasonable probability that a continuance would have been granted by a "reasonabl[e], conscientious[], and impartial[]" judge, *Strickland*, 466 U.S. at 695, thereby reducing Abney's mandatory minimum sentence by half.

Our dissenting colleague misapprehends our application of *Strickland*'s performance prong and misapplies the prejudice prong. Under *Strickland*'s objective standards, counsel was not required under the performance prong to anticipate how the Supreme Court would ultimately resolve the issue of retroactivity. Nor under *Strickland*'s prejudice prong is the subjective opinion of the sentencing judge about a continuance dispositive, for *Strickland* focuses on what a reasonable judge would do upon considering the relevant factors, which this court had identified before Abney's sentencing and which weigh in his favor. Our colleague's other objections lack merit. The

court's analysis adheres to *Strickland*'s two-prong approach and does not collapse the two prongs into one. *See* Dis. Op. 1–4. Nor does the court's analysis do violence to our republican form of government. *See id.* at 13.

Accordingly, because Abney was denied his Sixth Amendment right to the effective assistance of counsel, we remand the case for resentencing under the FSA.

**I.**

On December 17, 2007, Abney pleaded guilty to one count of possession with intent to distribute more than 50 grams of cocaine base (commonly known as crack cocaine), in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(iii). Under the plea agreement, if the government determined Abney provided it with "substantial assistance," then the government would ask the district court to depart from "either the Sentencing Guidelines or any applicable mandatory minimum sentence established by statute." Otherwise the mandatory minimum sentence for Abney's offense under the Controlled Substances Act was 10 years' imprisonment. Once the government determined Abney's cooperation had proved unsuccessful, the district court scheduled a sentencing hearing for October 13, 2009. The government twice moved to continue sentencing between October 2009 and August 2, 2010, because of Abney's arrest and incarceration in Maryland.

Five days before Abney's scheduled sentencing hearing, the House of Representatives, on July 28, 2010, joined the Senate in passing the FSA, Pub. L. No. 111-220, 124 Stat. 2372 (Aug. 3, 2010), reducing the mandatory minimum for Abney's offense by half, from 10 to five years. The drug amounts triggering mandatory minimums for crack-trafficking offenses in the Controlled Substances Act were increased from 5 grams

to 28 grams for the five-year minimum, and from 50 grams to 280 grams for the 10-year minimum. *See* FSA § 2(a), 124 Stat. at 2372 (amending 21 U.S.C. § 841(b)(1)(A)(iii), (b)(1)(B)(iii)). Congress's passage of this landmark sentencing reform was widely publicized, and it was well known that the President would promptly sign the legislation.[1]  Pursuant to Article I, Section 7 of the United States Constitution, the President had only 10 days (excepting intervening Sundays) upon presentment to sign the bill into law.  U.S. CONST. art. I, § 7.  The President signed it promptly on August 3, 2010.

Abney's counsel was aware that the FSA had passed both houses of Congress and believed that it "w[ould] soon be in place."  Def.'s Mem. in Aid of Sentencing at 2 n.1 (July 28, 2010).  In his sentencing memorandum, Abney's counsel wrote:

> As an indication of the unfairness in sentencing in cases like Mr. Abney's, counsel would note that new penalties for cocaine base will soon be in place, as the House and Senate have approved legislation reducing

---

[1] *See, e.g.*, Jim Abrams, *Congress Passes Bill to Reduce Disparity in Crack, Powder Cocaine Sentencing*, WASH. POST, July 29, 2010, at A09; Erik Eckholm, *Congress Moves to Narrow Cocaine Sentencing Disparities*, N.Y. TIMES, July 29, 2010, at A16; Press Release, The White House Office of National Drug Control Policy, Congress Passes Monumental Fair Sentencing Act and Restores Fairness to Cocaine Sentencing (July 28, 2010) (expressing Administration support for the FSA bill after it passed both houses of Congress); Press Release, Department of Justice, Statement of the Attorney General on Passage of the Fair Sentencing Act (July 28, 2010) (congratulating House of Representatives on passing the FSA); Press Release, Department of Justice, Statement of the Attorney General on Senate Judiciary Committee's Approval of the Fair Sentencing Act (Mar. 11, 2010) (applauding Senate Judiciary Committee's approval of bill that would become the FSA).

the powder/crack disparity to 18 to one. Under those guidelines 28 grams of crack would trigger the 5 year mandatory; it would take 280 grams to trigger the 10 year mandatory.

*Id.* Counsel also contemplated that the FSA might be applied to benefit Abney. In the same memorandum, he wrote: "[W]e would note that *absent some retroactivity*, Mr. Abney will be much more harshly punished than those committing and convicted of the same crime in the near future. He also will be effectively deterred longer than others." *Id.* at 2 (emphasis added). Counsel failed to mention — and, it seems, failed to consider — a core feature of the federal sentencing scheme under the Sentencing Reform Act of 1984, Pub. L. No. 98-473, § 212(a)(2), 98 Stat. 1837, 1989–90: that the applicable Sentencing Guidelines are those in effect at the time of sentencing, not those in effect when the offense was committed. 18 U.S.C. § 3553(a)(4)(A)(ii). As a consequence, counsel apparently overlooked an interpretation of the FSA courts were reasonably likely to adopt and thought, erroneously, that retroactivity would require "subsequent legislation," Sentencing Tr. at 6. So, counsel did not seek a continuance of Abney's sentencing date for any duration.

On August 2, 2010, the district court sentenced Abney to the 10-year mandatory minimum term of imprisonment. The court, however, lamented that outcome. At the sentencing hearing, it observed that, "[i]f the Court had some discretion, I probably would give you a sentence [of] . . . somewhere less than 120 months. I mean I wouldn't give you 60, but it would be somewhere in between . . . ." *Id.* at 7. The prosecutor acknowledged that the government "[wa]s aware of the new legislation that recently passed that certainly defense may raise *if he were at a different time*[, which] might change [Abney's] fate; but as of now that is not retroactive . . . ." *Id.* at 5

(emphasis added). Abney's counsel offered no response beyond suggesting that perhaps Abney's sentence "will be revisited with retroactivity down the road." *Id.* at 6. The district court noted, however, that "Congress, for whatever reason . . . has also decided that retroactivity is not out the door." *Id.* at 7.

The next day — August 3, 2010 — the President signed the FSA into law. As a result, the 100-to-1 crack-to-powder sentencing disparity was lowered to 18-to-1, and the mandatory minimum sentence for possession with intent to distribute 68 grams of crack cocaine — Abney's offense — was reduced from 10 years to five years. The Sentencing Commission was required to promulgate new Sentencing Guidelines "as soon as practicable, and in any event not later than 90 days after the date of enactment" of the FSA. FSA § 8, 124 Stat. at 2374 (codified at 28 U.S.C. § 994 note). The Commission did so on a temporary basis in Amendment 748, which became effective on November 1, 2010. U.S. SENTENCING GUIDELINES MANUAL app. C (2015) (Amendment 748). On April 6, 2011, the Commission made the amendment permanent. *Id.* app. C (Amendment 750) (effective Nov. 1, 2011); *see also id.* § 2D1.1(c). Then, on June 30, the Commission made retroactive the portions of Amendment 750 relevant to the crack-powder disparity. *Id.* app. C (Amendment 759) (effective Nov. 1, 2011); *see also id.* § 1B1.10(d). Subsequently, on June 21, 2012, the Supreme Court held in *Dorsey v. United States*, 132 S. Ct. 2321 (2012), that the FSA's new mandatory minimums applied to offenders who committed a crack cocaine offense before August 3, 2010 (when the FSA became law), but were not sentenced until after that date.

Once the Sentencing Commission made Amendment 750 retroactive, Abney, through new counsel, filed an Unopposed Motion to Reduce Sentence under 18 U.S.C. § 3582(c)(2) and 28 U.S.C. § 2255. Notably, the motion stated that the government

did not object to a reduction because "although it was well know[n] that the FSA was to become imminently effective, Mr. Abney's counsel *should have* asked, but did not, to continue Mr. Abney's sentencing in order to obtain the benefits of the amended statute." Unopposed Mot. to Reduce Sentence at 2–3 (Oct. 3, 2012) (emphasis added). At the motion hearing, the prosecutor explained, presciently, that the government, after consultation with the Criminal and Appellate Divisions of the United States Attorney's Office for the District of Columbia, did not oppose the motion because otherwise "the defense could come back with an argument that counsel was ineffective for failing to move to delay the sentencing at least one day until the Fair Sentencing Act was in effect" and there was "*significant* litigation risk on that claim." Mot. Hr'g Tr. at 4, 6 (Apr. 9, 2013) (emphasis added). The prosecutor further advised that in the government's view "there is the question of whether the [district] [c]ourt . . . would have abused its discretion in not continuing the sentencing date." *Id.* at 6. The prosecutor noted that "there had been fairly widespread attention within the defense Bar . . . to the fact that the law was going to change . . . ." *Id.* at 4. Abney's new counsel — a federal public defender — agreed, recounting being unable to "find any other case like this because frankly most people were continuing the sentences until after the date [the FSA became effective]." *Id.* at 14.

The district court denied Abney's unopposed motion for sentence reduction, stating this court's precedent "made it clear that the FSA's lower mandatory minimum sentences do not apply retroactively to offenders who were sentenced *before* the Act became effective on August 3, 2010." Mem. Order at 3 (Feb. 7, 2014) (citing *United States v. Bigesby*, 685 F.3d 1060, 1066 (D.C. Cir. 2012)) (emphasis in original). The court declined to consider Abney's ineffective assistance claim, "constru[ing] [the] motion solely as a motion to reduce his

sentence under 18 U.S.C. § 3582(c)(2)," *id.* at 2 n.2, because "Abney ha[d] not expressly raised and fully briefed an ineffective assistance of counsel claim under 28 U.S.C. § 2255," *id.* at 5 n.4.

Abney's present counsel filed an Unopposed Motion for Reconsideration, pursuant to Federal Rule of Civil Procedure 59(e), on his ineffective assistance of counsel claim under 28 U.S.C. § 2255. Counsel argued that "[t]here is no conceivable possible strategy that could cause an attorney to neglect to ask for a continuance when a law reducing his client's sentence by half is immediately forthcoming." Unopposed Mot. for Recons. at 8 (Feb. 24, 2014); *see also id.* at 9–10. The district court ruled Abney had not satisfied either of *Strickland*'s prongs: On performance, counsel's failure to seek a continuance was not objectively unreasonable because "it was far from apparent on the day of [Abney's] sentencing . . . that the FSA, once enacted, could apply retroactively to offenders, like Abney, whose *conduct* occurred before the FSA's effective date [for] the FSA legislation itself contained no retroactivity provision." Mem. Order at 2 (Aug. 29, 2014) (emphasis in original). On prejudice, "it is completely speculative — not 'reasonably probable' — that this Court would have granted a defense motion to continue the sentencing until some unspecified future date based on the uncertain applicability of a future law," *id.* at 3, especially given that Abney's sentencing had already been delayed as a result of his arrest and incarceration in Maryland, *id.*

Abney appeals the denial of his Rule 59(e) motion for reconsideration, and this court granted a certificate of appealability on the issue of whether sentencing counsel's failure to move for a continuance of Abney's sentencing constituted ineffective assistance under the Sixth Amendment to the U.S. Constitution. Order, *United States v. Abney*, No. 14-3074 (D.C. Cir. Jan. 13, 2015).

10

## II.

Under *Strickland v. Washington*, 466 U.S. 668 (1984), to succeed on a claim of ineffective assistance of counsel,

> [f]irst, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or . . . sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 687. "The proper measure of attorney performance" is "reasonableness under prevailing professional norms." *Id.* at 688. Counsel's performance is "deficient" when his representation falls below an objective standard of reasonableness. *United States v. Rodriguez*, 676 F.3d 183, 189 (D.C. Cir. 2012). The prejudice prong requires a showing of a "reasonable probability that, but for counsel's unprofessional errors, the result of [his sentencing] would have been different." *Strickland*, 466 U.S. at 694. We first address our standard of review and then proceed to our analysis of Abney's claim under the *Strickland* test.

### A.

Abney appeals the denial of his motion for reconsideration. Although this court may "normally review district court denials of Rule 59(e) motions only for abuse of discretion," *Dyson v.*

*District of Columbia*, 710 F.3d 415, 420 (D.C. Cir. 2013), "[t]here are some situations . . . in which we review the District Court's denial of a motion for reconsideration *de novo*," *id.* "This case presents such a situation," *id.*, because the district court first considered the merits of Abney's ineffective assistance of counsel argument in denying his motion for reconsideration, *see id.* Where a district court denies a motion for reconsideration on the merits, "we . . . review that decision *de novo*." *Patton Boggs LLP v. Chevron Corp.*, 683 F.3d 397, 402 n.4 (D.C. Cir. 2012).

When the issue of ineffective assistance of counsel has come before this court in other procedural postures, the court has purported to remain agnostic on whether the standard of review of the denial of a Sixth Amendment claim of ineffective assistance of counsel is *de novo* or for abuse of discretion. *See United States v. Toms*, 396 F.3d 427, 433 (D.C. Cir. 2005). In those cases, the court has held the appeal failed under either standard. *See, e.g.*, *United States v. McDade*, 699 F.3d 499, 506 (D.C. Cir. 2012); *accord United States v. Newman*, 805 F.3d 1143, 1146 (D.C. Cir. 2015); *United States v. Shabban*, 782 F.3d 3, 7 (D.C. Cir. 2015). Where this court has found merit to an ineffective assistance of counsel argument, however, it has not characterized what occurred in the district court as an abuse of discretion but rather has based its conclusion upon review that was, in fact, *de novo*. For instance, in *Payne v. Stansberry*, 760 F.3d 10 (D.C. Cir. 2014), the court stated that it was "review[ing] the district court's factual findings for clear error and questions of law *de novo*," *id.* at 13. Similarly, in *Rodriguez*, 676 F.3d at 189–92, the court stated only that it was applying the two prongs of the *Strickland* test. In both cases, the court determined for itself whether counsel was unconstitutionally ineffective. We now make explicit what these cases imply: we review *de novo* a denial of an ineffective assistance of counsel claim.

The court is on firm ground in applying a *de novo* standard. The Supreme Court's analysis in *Strickland* and its subsequent ineffective assistance decisions evinces a standard of review consistent with *de novo* review. In these cases, the Supreme Court examines the record independently, with no apparent deference to the district or state court's ineffective assistance analysis. *See, e.g.*, *Hinton v. Alabama*, 134 S. Ct. 1081, 1087–90 (2014); *Missouri v. Frye*, 132 S. Ct. 1399, 1408–10 (2012); *Strickland*, 466 U.S. at 698–700. Virtually all of our sister circuit courts of appeals apply a *de novo* standard of review. *See Pham v. United States*, 317 F.3d 178, 182 (2d Cir. 2003); *United States v. Cross*, 308 F.3d 308, 314 (3d Cir. 2002); *United States v. Roane*, 378 F.3d 382, 395 (4th Cir. 2004); *United States v. Bass*, 310 F.3d 321, 325 (5th Cir. 2002); *Mallett v. United States*, 334 F.3d 491, 497 (6th Cir. 2003); *United States v. Fudge*, 325 F.3d 910, 923 (7th Cir. 2003); *United States v. Davis*, 406 F.3d 505, 508 (8th Cir. 2005); *United States v. Chacon-Palomares*, 208 F.3d 1157, 1158 (9th Cir. 2000); *United States v. Orange*, 447 F.3d 792, 796 (10th Cir. 2006); *Osley v. United States*, 751 F.3d 1214, 1222 (11th Cir. 2014); *cf. United States v. Manon*, 608 F.3d 126, 132 (1st Cir. 2010).

**B.**

To establish deficient performance by counsel under *Strickland*'s first prong, a "defendant must overcome the [strong] presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (internal quotation marks omitted). Because "the record does not explicitly disclose . . . counsel's actual strategy or lack thereof . . . , the presumption may only be rebutted through a showing that no sound strategy posited by the [opposing party, here the government] could have supported the conduct." *Thomas v. Varner*, 428 F.3d 491, 500 (3d Cir. 2005) (citing *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003)). The government suggests on appeal that Abney's "counsel might

have been worried about the potential adverse ramifications of new minimums for the bargain [Abney] had struck [in pleading guilty pursuant to a plea agreement] three years before." Appellee's Br. 23; *see also id.* at 23–24. In *United States v. Douglas*, 644 F.3d 39 (1st Cir. 2011), the First Circuit observed that "it may well be arguable that — where the earlier and higher penalty was part of the bargain — the government may in certain circumstances be entitled to withdraw from the plea agreement if the bargain is now frustrated by the change in penalties." *Id.* at 45. Further, the government notes, Abney's sentencing had twice been postponed because he was incarcerated in Maryland, so "with the possibility of an upward variance looming, counsel might have reasonably concluded that it would be unwise to press the court for yet a third continuance, believing this might unduly focus the court on the misconduct which had necessitated the earlier postponements." Appellee's Br. 25.

These proffered strategic rationales are implausible. The plea agreement on its face is not conditioned on Abney's receiving a 10-year prison sentence: the agreement repeatedly disavows any certainty as to sentencing, and it does not grant the government the authority unilaterally to withdraw from the plea agreement should the sentence imposed be less than ten years. At sentencing the district court was already aware of the Maryland state charge, which Abney's counsel noted in his sentencing memorandum had been dismissed. Further, the government never indicated to the district court that it would seek an upward variance. And the district court's remarks prior to imposing sentence expressed a preference, in the absence of the 10-year mandatory minimum, for a Guidelines-range sentence or a downward departure. On this record, we conclude that there is no conceivable strategy that would justify the failure of Abney's counsel to seek a continuance of sentencing. Rather, it appears that counsel's failure stemmed from his unfamiliarity

with the existence of more than one reasonably likely interpretation of the FSA. *Cf. Varner*, 428 F.3d at 501. "[A]bsent a strategic decision by counsel, the ineffectiveness prong of *Strickland* turns on whether an objectively reasonable attorney would have [sought a continuance] because the issue had a reasonable likelihood of success. 'In other words, this is the rare case where both *Strickland* prongs turn on the same question, whether there is a reasonable probability that the outcome of [Abney's sentencing] would have been different had this issue been raised.'" *Payne*, 760 F.3d at 14 (quoting *Roe v. Delo*, 160 F.3d 416, 419 (8th Cir. 1998)). Contrary to the dissent, Dis. Op. 1–4, this observation does not collapse *Strickland*'s two prongs into one. Under the performance prong, the question hinges on the reasonable probability that courts would adopt a given interpretation of a new statute, while under the prejudice prong, the question is whether it was reasonably probable that a continuance would have been granted. The analysis under each prong remains distinct.

Under the first prong of *Strickland*, counsel's performance is "deficient" when counsel's representation is not objectively reasonable, *see Rodriguez*, 676 F.3d at 189, as measured by the "prevailing professional norms," *Strickland*, 466 U.S. at 688. The failure of Abney's counsel to seek a continuance of sentencing was objectively unreasonable and therefore unconstitutionally deficient. The FSA's impending enactment was so important and widely publicized — and the reasonable likelihood of its retroactive effect so apparent — that objectively reasonable counsel would have known about it and the open retroactivity question, irrespective of what Abney's counsel subjectively knew. The FSA's significant reduction in the mandatory minimum faced by Abney provided sufficient grounds to pursue the reasonably likely interpretation that the reduction would apply to offenders sentenced after the date of its enactment. Clues regarding retroactivity were present at the

sentencing hearing itself. The district court noted that the retroactive effect of the FSA was "not out the door" in Abney's circumstances, Sentencing Tr. at 7, suggesting there was no need for additional legislation. The government acknowledged that the timing of Abney's sentencing might affect his sentence. And illustrative of the "prevailing professional norms," *Strickland*, 466 U.S. at 688, the defense Bar was endeavoring to preserve the chance that criminal defendants might benefit from the FSA's lower mandatory minimums by seeking continuances until after its enactment, as shown in cases where defendants were similarly situated to Abney. *See, e.g.*, *United States v. Thompson*, 721 F.3d 711, 714 (D.C. Cir. 2013); *United States v. Fields*, 699 F.3d 518, 521–23 (D.C. Cir. 2012); *United States v. McMahon*, 422 F. App'x 523, 524–26 (6th Cir. 2011); *United States v. Spires*, 628 F.3d 1049, 1055 (8th Cir. 2011); *United States v. McClendon*, 379 F. App'x 898, 899–901 (11th Cir. 2010). Abney's new counsel — a federal public defender — in seeking a reduction of sentence "couldn't find any other case like [Abney's] because frankly most people were continuing the sentences until after [the FSA became effective]." Mot. Hr'g Tr. at 14 (Apr. 9, 2013). The prosecutor's comments regarding the defense Bar were similar. *Id.* at 4. Yet, counsel for Abney failed to seek a continuance of sentencing. In these circumstances, that amounted to a failure to provide "reasonably effective assistance." *Strickland*, 466 U.S. at 687.

On appeal, the government, like our dissenting colleague, has skewed the performance issue in arguing that *Dorsey*'s holding was unforeseeable. *See* Dis. Op. 1, 7–9; Appellee's Br. 15–20. The retroactive effect of the FSA, the Supreme Court observed, was ambiguous because "relevant language in different statutes argue[d] in opposite directions" and the courts of appeals had reached "different conclusions" on the import of those statutes. *Dorsey*, 132 S. Ct. at 2330–31 (referencing 1 U.S.C. § 109 and 18 U.S.C. § 3553(a)(4)(A)(ii)). What is not

ambiguous is the performance prong issue in Abney's case. The issue is not, did Abney receive unconstitutionally inadequate representation because his counsel failed to seek a benefit for his client based on an *unforeseeable* interpretation of the FSA's retroactivity? Instead, the performance prong issue is, did Abney receive unconstitutionally inadequate representation because counsel failed to seek a benefit for his client based on one of two *reasonably likely but uncertain* interpretations of the FSA's retroactivity? The interpretation of the FSA adopted in *Dorsey* was not a novel invention of the Supreme Court. Prior to *Dorsey*, defense attorneys argued — and some courts agreed — that the FSA's mandatory minimums applied to pre-FSA conduct, depending on the date of sentencing. *See, e.g.*, *United States v. Dixon*, 648 F.3d 195, 198–203 (3d Cir. 2011); *Douglas*, 644 F.3d at 42–44. Even prior to congressional passage of the FSA, defense attorneys who sought sentencing continuances — including counsel's fellow federal public defenders — realized that it was reasonably likely that the date of sentencing would determine the applicability of the FSA's lower mandatory minimums. *See, e.g.*, *Thompson*, 721 F.3d at 712, 714; *Fields*, 699 F.3d at 519, 521–23.

Where sentencing benefits are available under existing law, this court has concluded that counsel is ineffective when he fails to advocate on his client's behalf at sentencing. *See Rodriguez*, 676 F.3d at 191; *United States v. Soto*, 132 F.3d 56, 59 (D.C. Cir. 1997). Whether counsel's representation is deficient due to misinterpretation of the Sentencing Guidelines or failure to invoke a salient Guidelines provision, "such drastic missteps clearly satisfy *Strickland*'s first test: They amount to errors 'so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'" *Soto*, 132 F.3d at 59 (quoting *Strickland*, 466 U.S. at 687). "'[F]amiliarity with the structure and basic content of the Guidelines . . . has become a necessity for counsel who seek to give effective

representation.'" *United States v. Gaviria*, 116 F.3d 1498, 1512 (D.C. Cir. 1997) (alteration in original) (quoting *United States v. Day*, 969 F.2d 39, 43 (3d Cir. 1992)).

In view of counsel's "overarching duty to advocate the defendant's cause," *Strickland*, 466 U.S. at 688, Abney's counsel could not remain silent when there was a substantial sentencing benefit — a five-year reduction in the mandatory minimum — that was reasonably likely to apply to his client if his sentencing were postponed. Counsel had an obligation to examine the FSA with enough care to detect what other counsel already had, namely the reasonable likelihood that courts would interpret the FSA's mandatory minimums provision to apply to defendants sentenced after its effective date. That was one of two interpretations of the FSA available at the time of Abney's sentencing that courts were reasonably likely to adopt. Both interpretations revolved around the General Saving Statute, 1 U.S.C. § 109, which establishes a presumption against retroactivity for new criminal laws that reduce penalties in an earlier statute. The presumption, however, is rebutted if the new statute expressly or by "fair implication" indicates that Congress intended it to have retroactive effect. *See Warden, Lewisburg Penitentiary v. Marrero*, 417 U.S. 653, 659 n.10 (1974). One of the available interpretations was that the FSA does not clearly evince congressional intent to give the FSA's mandatory minimums retroactive effect. *See Dorsey*, 132 S. Ct. at 2339–44 (Scalia, J., dissenting). Counsel's error here appears to have been that he assumed this was the only available interpretation of the FSA and that the FSA could not be fairly read to imply that Congress intended its mandatory minimums to apply to all defendants sentenced after its enactment. Hence, counsel concluded "subsequent legislation" was necessary to render the FSA's minimums applicable to Abney. Sentencing Tr. at 6.

The other available interpretation was that the FSA does fairly imply that Congress wanted its mandatory minimums to apply to defendants sentenced after its enactment. The FSA reduced the mandatory minimum sentencing disparity from 100-to-1 to 18-to-1 for crack and powder offenses, FSA § 2(a), 124 Stat. at 2372, and Congress directed the Sentencing Commission to "promulgate the guidelines, policy statements, or amendments provided for in this Act as soon as practicable, and in any event not later than 90 days after the date of enactment of this Act," and to "make such conforming amendments" to the Guidelines as needed "to achieve consistency with other guideline provisions and applicable law," FSA § 8, 124 Stat. at 2374. A core feature of federal sentencing under the Sentencing Reform Act of 1984 is that the applicable Sentencing Guidelines are those in force at the time of sentencing, not at the time of the underlying offense. 18 U.S.C. § 3553(a)(4)(A)(ii). Reasonably competent counsel are expected to be familiar with such basic precepts of the federal sentencing regime. *Cf. Rodriguez*, 676 F.3d at 191; *Gaviria*, 116 F.3d at 1512. Familiarity here would have alerted Abney's counsel to the unusual result that flows from interpreting the FSA's lower mandatory minimums to apply only to post-FSA conduct. Congress had mandated the Sentencing Commission to establish new Guidelines based on an 18-to-1 crack-to-powder ratio so as to promptly end the sentencing unfairness it rejected in the FSA. Depending on the Commission's dispatch, new Guidelines could have gone into effect any day within 90 days after enactment. Once in effect the new Guidelines would apply immediately, so that a defendant sentenced then and thereafter for a pre-FSA crack-trafficking offense would face a Guidelines range based on the 18-to-1 ratio. Yet, if the pre-FSA mandatory minimums still applied to such offenders, a defendant subject to a Guidelines range based on the 18-to-1 ratio would nevertheless face a mandatory minimum sentence based on the 100-to-1 ratio. Congress passed the FSA in response to the Sentencing

Commission's repeated recommendations that the crack-to-powder ratio be reduced, *see Dorsey*, 132 S. Ct. at 2328–29, and it was widely known that the purpose of the FSA was to eliminate the 100-to-1 disparity, which Congress had declared unfair, *see, e.g.*, FSA pmbl., 124 Stat. at 2372. Why would Congress insist on the near-immediate reduction of the 100-to-1 disparity in the Sentencing Guidelines for defendants sentenced after the FSA's enactment but leave in place for those same defendants the old, unfair mandatory minimums? Counsel would not have had any reason, where the question remained open, to conclude courts would inevitably embrace an interpretation of the FSA that preserved the mandatory minimums when courts had long noted the unfairness of the 100-to-1 disparity. *See, e.g.*, *Kimbrough v. United States*, 552 U.S. 85, 109–11 (2007).

Counsel was not required to predict which of these interpretations would ultimately carry the day. He was merely required to consider the FSA carefully enough to recognize there was more than one available interpretation courts were reasonably likely to adopt — one of which would benefit his client — and to seek a continuance so that his client would benefit if the favorable interpretation prevailed. "In these circumstances, reasonably effective counsel would have raised the issue, if for no other reason than to preserve" the possibility that Abney could benefit from the FSA's lower mandatory minimum. *See United States v. Marshall*, 669 F.3d 288, 293 (D.C. Cir. 2011).

The government's new response on appeal misses the mark. It maintains that Abney's "counsel cannot be faulted for failing to anticipate, and act upon, *Dorsey*'s complex and novel legal ruling." Appellee's Br. 19; *see also* Dis. Op. 1, 7–9, 13–14. Such clairvoyance is not the test under *Strickland*. *See Maryland v. Kulbicki*, 136 S. Ct. 2, 4–5 (2015); *cf. Brown v.*

*United States*, 311 F.3d 875, 878 (8th Cir. 2002); *Bullock v. Carver*, 297 F.3d 1036, 1052 (10th Cir. 2002). Instead, due diligence required that counsel press available, reasonably likely interpretations of the FSA in seeking a continuance of his client's sentencing. This is not a case where the ultimate interpretation of the FSA in *Dorsey* was "unpredictab[le]," as the government would have it. Appellee's Br. 17; *see also* Dis. Op. 1, 7–9, 13–14. Prior to *Dorsey*, lower courts reached the same interpretive conclusion the Supreme Court reached. *See Dorsey*, 132 S. Ct. at 2330 (collecting cases). Indeed, according to some jurists, application of the FSA's new mandatory minimums to any defendant sentenced after its enactment was the "only implication that makes sense," given the words Congress chose, *United States v. Holcomb*, 657 F.3d 445, 456 (7th Cir. 2011) (Williams, J., dissenting from denial of rehearing *en banc*), and a different reading would produce "absurd results," *id.* at 461 (Posner, J., dissenting from denial of rehearing *en banc*). As these jurists explained, to interpret the FSA otherwise would be to impute to Congress the puzzling intent that defendants be sentenced under Sentencing Guidelines consistent with the new 18-to-1 ratio but under mandatory minimums based on the old 100-to-1 disparity, which Congress had deemed unfair. Nor is this a case where counsel had to predict anything. Abney's counsel had only to read the law passed by Congress and consider it in light of an existing sentencing principle — that the applicable Guidelines are those in effect at the time of sentencing, not at the time of the underlying offense — to recognize the reasonable likelihood that courts would interpret the FSA's mandatory minimums to apply based on the date of sentencing.

Of course, "Abney's counsel could not have known that the President would sign the FSA the [day after Abney's scheduled sentencing]. But this is a quibble, for the record shows that . . . Abney's counsel believed that as of July 28 [five days before

Abney's scheduled sentencing] the law would 'soon be in place,'" Appellant's Br. 22 (citing Def.'s Mem. in Aid of Sentencing at 2 n.1), and counsel "could have requested a continuance for no longer than the mere ten days the President had to sign the bill into law," *id.* As Abney rightly notes, "[w]hile retroactivity tied to the date of sentencing still presented the question of whether August 3, 2010 (the date of the FSA's enactment) or November 1, 2010 (the latest date the FSA-mandated amended guidelines could have come into effect) . . . was the significant date, that uncertainty does not validate counsel's failure." Reply Br. 5 n.2 (internal citation omitted). Objectively reasonable counsel would have sought a continuance to ensure that Abney was sentenced after the FSA became law. There was no strategic reason not to, and the failure to do so was unjustifiable because "it cost the defense nothing and the possible benefit . . . was undoubtedly significant," *United States v. Hylton*, 294 F.3d 130, 134 (D.C. Cir. 2002).

Our dissenting colleague's primary disagreement with this performance prong analysis is that it demands too much of defense counsel. Dis. Op. 3–4, 8–9. Not so. As this court has long acknowledged (*see, e.g.*, *Soto*, *Gaviria*, *supra*), the Sixth Amendment requires defense counsel to keep apprised of changes to sentencing law that may affect his client and to invoke them appropriately. Nothing in the court's analysis today would obligate counsel blindly "to pursue any action that might reasonably benefit the client." Dis. Op. 3. Instead, Abney's case concerns the imminent enactment of watershed sentencing reform that cut in half the mandatory minimum sentence he was facing, by five years. Counsel was not only obligated to be aware of this fact, as Abney's counsel was, but in the absence of any strategic considerations, counsel was also obligated to pursue sentencing benefits arising from available, reasonably probable interpretations of new sentencing laws. This standard

does not oblige counsel to take into account any and every possible interpretation. Consistent with professional standards and constitutional requirements, it reflects what defense counsel should be doing already. *See, e.g.*, *Thompson*, 721 F.3d at 714; *Fields*, 699 F.3d at 521–23; *McMahon*, 422 F. App'x at 524–26; *Spires*, 628 F.3d at 1055; *McClendon*, 379 F. App'x at 899–901; *see also* Mot. Hr'g Tr. at 14 (Apr. 9, 2013). After all, basic statutory interpretation is a regular feature of the work of any reasonably competent defense counsel. And, as discussed, there are no strategic considerations here to excuse Abney's counsel's failure to act on a reasonably probable interpretation of a statute that could benefit his client. *See* Dis. Op. 4, 9–10. Rather, Abney's counsel's approach was guided by a misunderstanding of the FSA, a failure that stemmed from legal error, not strategic decisionmaking. To the extent our dissenting colleague does not believe counsel misunderstood the FSA at all, that objection is not grounded in *Strickland* or the facts of Abney's case but represents a criticism of the majority's interpretation of the FSA in *Dorsey*. *Id.* at 13–14.

Congress's actual passage of the FSA and the imminence of the President's signature — as well as the failure of Abney's counsel to seek a continuance — distinguish our decisions in *Thompson*, 721 F.3d 711, and *Fields*, 699 F.3d 518. In *Thompson*, 721 F.3d at 714–15, the court held that counsel did not render ineffective assistance when he tried and failed to secure a continuance of sentencing until after enactment of the FSA, where passage of that statute was still seven months away and entirely speculative. Similarly, in *Fields*, 699 F.3d at 521–23, there was no abuse of discretion when the district court denied a continuance eight months before the FSA became law, when its enactment was anything but guaranteed. The same distinction applies to other cases the government cites. *See Becerra v. United States*, Nos. 7:09-CR-79-D, 7:12-CV-265-D, 2013 WL 2285350, at *6 (E.D.N.C. May 23, 2013); *Torres v.*

*United States*, Civ. A. No. 3:12-01167, Crim. A. No. 3:09-00110, 2013 WL 1349126, at *3 (S.D. W. Va. Apr. 1, 2013); *United States v. Jeanpierre*, No. 07CR439(6), 2012 WL 4898182, at *2 (D. Minn. Oct. 16, 2012); *United States v. Richardson*, Crim. No. 08-397, Civ. No. 11-2321, 2011 WL 6003952, at *3 (D. Minn. Nov. 30, 2011); *United States v. Musallet*, Nos. 07-20099, 11-2008, 2011 WL 1303305, at *2–3 (D. Kan. Apr. 1, 2011).

## C.

Under *Strickland*'s second, but-for prejudice prong, 466 U.S. at 694, the objective inquiry continues. Importantly, the Supreme Court has instructed that the prejudice inquiry does "not depend on the idiosyncracies of the particular decisionmaker," *id.* at 695, but rather requires an appellate court to consider how a motion for a continuance would have been evaluated by a hypothetical judge "reasonably, conscientiously, and impartially applying the standards that govern the decision," *id.*

In *United States v. Gantt*, 140 F.3d 249 (D.C. Cir. 1998), this court identified the factors to be weighed by a district court in considering a motion for a continuance to include:

> the length of the requested delay; whether other continuances have been requested and granted; the balanced convenience or inconvenience to the litigants, witnesses, counsel, and the court; whether the requested delay is for legitimate reasons, or whether it is dilatory, purposeful, or contrived; whether the defendant contributed to the circumstance which gives rise to the request for a continuance; whether the defendant has other competent counsel prepared to try the case, including the consideration of whether the other counsel was retained as lead or associate counsel; [and] whether denying the continuance will result in

identifiable prejudice to defendant's case, and if so, whether this prejudice is of a material or substantial nature.

*Id.* at 256 (alteration in original) (quoting *United States v. Burton*, 584 F.2d 485, 490–91 (D.C. Cir. 1978)). These factors weigh in Abney's favor, and it is reasonably likely that, had a continuance of sentencing been sought, *Strickland*'s reasonable, conscientious, and impartial district court would have granted it, *see Strickland*, 466 U.S. at 695.

By the time Abney was scheduled to be sentenced, the FSA had been passed by both houses of Congress and was mere days away from the President's signature. The FSA's text made it reasonably likely, even if not a certainty, that courts would interpret the FSA to apply to offenders like Abney who had yet to be sentenced. To interpret the FSA otherwise would result in the same defendant being subject to Guidelines reflecting the FSA's reduced crack-powder disparity while still subject to the old statutory mandatory minimums that Congress had already found unfair, a result some jurists concluded "would 'undercut the bill's primary objective,' 'result in sentencing anomalies Congress surely did not intend,' benefit the 'worst offenders,' give 'rise to . . . oddities,' and 'not necessarily promote more equitable outcomes,'" *Holcomb*, 657 F.3d at 460 (Williams, J., dissenting from denial of rehearing *en banc*) (quoting *Abbott v. United States*, 562 U.S. 8, 20–22 (2010)). *See Dorsey*, 132 S. Ct. at 2331–35; *Holcomb*, 657 F.3d at 453–57 (Williams, J., dissenting from denial of rehearing *en banc*); *id.* at 461–63 (Posner, J., dissenting from denial of rehearing *en banc*); *Dixon*, 648 F.3d at 198–203; *Douglas*, 644 F.3d at 42–44. Under the FSA, had his sentencing been continued, Abney would have been subject to a mandatory minimum sentence half as long as the one under which he was sentenced. Although the district court had granted the government two previous continuances due to

Abney's incarceration in Maryland, delay for which Abney bears responsibility, the other relevant *Gantt* factors, taken together, indicate that it was reasonably probable an objectively reasonable judge would have granted a request to postpone Abney's sentencing: the length of the requested delay would have been finite; the inconvenience to the litigants, witnesses, counsel, and the district court would have been minimal so far as the record indicates; the requested delay would have been for legitimate reasons; Abney would not have contributed to the circumstances that gave rise to this particular request for a continuance; and denying the continuance would have resulted in his identifiable and substantial prejudice. *See Gantt*, 140 F.3d at 256.

Our dissenting colleague emphasizes delay in Abney's sentencing, Dis. Op. 9–10, but ignores both the balance of the *Gantt* factors and that Abney was not at liberty pending sentencing. Nor is any precedent offered for the novel proposition, contrary to the Supreme Court's instruction in *Strickland*, that an appeals court should accept the subjective "assessment," *id.* at 12, of a particular district court judge. The dissent's approach would replace *Strickland*'s objective prejudice analysis with a test that falls somewhere between a subjective inquiry and a deference doctrine. Additionally, as reported cases reversing district courts make obvious, the court's analysis requiring a remand for resentencing is neither "discrediting" nor "abusing" the district court. *Id.*

Finally, it was reasonably probable that if the FSA had applied, Abney would have received a lower sentence. Prior to the FSA, a 10-year mandatory minimum constrained the district court's sentencing discretion. The FSA halved the minimum, reducing the mandatory minimum to five years. Given Congress's redetermination of the appropriate minimum and its emphasis in the FSA on promptly lowering sentences for crack

cocaine offenses under revised Guidelines, there is no reason to conclude that an objective, "reasonabl[e], conscientious[], and impartial[]" district judge, *Strickland*, 466 U.S. at 695, sentencing Abney after the FSA became effective would impose a prison term of 10 years or more. "On this record, we believe there is a 'reasonable probability' that [Abney] would have received a lower sentence had his Guidelines range factored in [the five-year mandatory minimum]." *Rodriguez*, 676 F.3d at 192 (quoting *Strickland*, 466 U.S. at 694).

Accordingly, because Abney has shown that his counsel's performance at sentencing was objectively unreasonable and that he suffered prejudice as a result, we reverse the denial of his motion for reconsideration and remand the case to the district court for resentencing under the FSA.

BROWN, *Circuit Judge*, dissenting: It is hard to say whether a medium or a fortune-teller would be best suited for this case. The Court's opinion seems to be one part *Back to the Future*, requiring trial counsel to possess a DeLorean, a flux capacitor and the inventiveness of the fictional Doc Brown in order to render competent assistance to a client. But it is another part *Zombie Apocalypse*, intent on disinterring the grisly remains of the long defunct approach of purposive judicial interpretation. Because neither approach is consistent with precedent and our judicial responsibilities, I respectfully dissent.

It seems silly to recite again the familiar ineffective-assistance standard of *Strickland v. Washington,* 466 U.S. 668 (1984), but circumstances demand clarity. Under the *Strickland* framework, a defendant must first establish "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687. If so, the defendant must then demonstrate the deficient performance was prejudicial by showing "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (quoting *Strickland*, at 694).

Today, the Court replaces this familiar two-part test with a one-part test of its own making. Under this new version of *Strickland*, an attorney's conduct is ineffective if the attorney failed to pursue an action that "had a reasonable likelihood of success." Maj. Op. at 13. The Court is open about this elision, calling this "the rare case where both *Strickland* prongs turn on the same question, whether there is a reasonable probability that the outcome of [Abney's

sentencing] would have been different had this issue been raised." Maj. Op. at 13-14.

Examination reveals this novel conception of the *Strickland* standard has a limited lineage and, in our circuit, a common progenitor. Only three circuit court opinions have ever stated that the two prongs of *Strickland* operate, in rare instances, as one. *See Etherton v. Rivard*, 800 F.3d 737 (6th Cir. 2015), *petition for cert. pending*, Docket No. 15-723; *Payne v. Stansberry*, 760 F.3d 10 (D.C. Cir. 2014); and *Roe v. Delo*, 160 F.3d 416 (8th Cir. 1998). The idea originated in dicta in *Roe*, a case in which counsel failed to raise a plain-error claim on appeal despite what the court found to be a reasonable possibility that such a claim would succeed under the circumstances. *See* 160 F.3d at 420. Counsel could not recall why the claim had been omitted and stated that, whatever the reason, it was *not* a strategic decision. *Id*. at 418-19.

This Court picked up the idea sixteen years later, in an opinion authored by the same judge writing for the majority today. *Payne*, 760 F.3d 10 (D.C. Cir. 2014). Citing only *Roe*'s diktat for support, this Court professed to have found another "rare case" in which the two prongs of *Strickland* mean the same thing. *Payne*, 760 F.3d at 14. The Court recycles the same language today—raising the curious question of how the "rare" cases in which the *Strickland* standard conveniently reduces itself to a one-part efficacy test has occurred twice in little more than a year. Is there now a reasonable possibility this rarity will soon become routine?

The single-prong *Strickland* test has a shallow provenance for good reason. It is an elision of an important constitutional test that results in substantively different outcomes. The Court imports the reasonable probability

standard of *Strickland*'s second part into its first part. Under this novel formulation, a defendant who satisfies the second, prejudice prong of *Strickland* will *always* satisfy the first, objective-standard prong of *Strickland*, because whether an attorney's conduct fell below a professional standard depends on whether the attorney took every step that had some reasonable possibility of success for the client. By collapsing *Strickland* into this single step, the Court transforms the objective standard of *Strickland* into a retroactive assessment of the "rightness" of a defendant's outcome. Defendants who could have had better outcomes if their counsel had made different arguments will, by inference, have received ineffective assistance. Under the Court's approach, a lawyer is obligated to pursue any action that might reasonably benefit the client. Failing to do so constitutes unreasonable attorney conduct, and hence, it amounts to constitutionally ineffective assistance.

This is not the approach endorsed by *Strickland.* *Strickland*'s second prong is about whether a defendant was prejudiced by his counsel's ineffective assistance. But a court may reach the second prong *only if* counsel's performance is adjudged ineffective under an objective standard. That's because the second prong of the *Strickland* test is remedial in nature—it's not about *whether there was a constitutional violation* but about *what we do after we know there was a constitutional violation*. If a defendant's outcome would have been the same, we say the constitutional violation was harmless. If there is a "reasonable probability" the outcome would have been different, then we take some type of action to remedy the constitutional problem.

Today the Court says the existence of a "reasonable probability" of a different outcome actually *answers* the first prong of *Strickland*: whether there was a constitutional

violation in the first place. Never mind that prong one of *Strickland* has its own standards for determining whether a constitutional violation occurs—standards that focus entirely on the realm of reasonable legal *strategies*, not the range of preferable legal *outcomes*. *Strickland* has always been about acknowledging the strategic aspect of lawyering. It is a commonplace observation that a lawyer simply cannot predict what will and will not work. Defendants have no right to counsel with flawless judgment; rather, the purpose of the right to effective counsel "is simply to ensure that criminal defendants receive a fair trial." *Id.* at 689.

The worst part of the Court's new, amalgamated *Strickland* standard is that it doesn't work. Trial counsel often face multiple strategic options, each presenting a reasonable possibility of benefitting the client's interests, but also presenting a reasonable possibility of harming the client's interests. For example, in most circumstances, when defense counsel considers whether to present a witness, there is a *reasonable possibility* the witness will benefit the client's case, but also some possibility the witness will be a dud or even diminish the client in the jury's eyes. If we second-guessed all of counsel's decisions on the basis of whether they might have had a reasonable possibility of changing an outcome, then nearly any decision that doesn't pan out would amount to ineffective assistance. And that is exactly what *Strickland* says we shouldn't do: "Judicial scrutiny of counsel's performance must be highly deferential," and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland,* 466 U.S. at 689.

So applying the *Strickland* standard in the right order, we should ask whether Abney's counsel rendered ineffective assistance in the first place—whether it was objectively unreasonable for counsel not to seek a continuance of Abney's sentencing on the basis of the pending Fair Sentencing Act.

To start, we know Abney's counsel was aware of the Fair Sentencing Act, which was then awaiting the President's signing decision. Abney's counsel noted at sentencing that "new penalties will soon be in place" that would leave Abney "much more harshly punished than those committing and convicted of the same crime in the near future." J.A. 18. But Abney's counsel did not think Abney could benefit from the new law's more lenient penalties "absent subsequent legislation making [the Fair Sentencing Act] retroactive." J.A. at 25. In other words, Abney's counsel was aware of the developing legal changes, and he considered the law's applicability to Abney. *Cf. Torres v. United States*, 2013 WL 1349126, at *3 (S.D. W.Va. Apr. 1, 2013) (finding counsel sufficient despite no evidence counsel actually knew of the Fair Sentencing Act's impending enactment). Counsel concluded, however, that it would take some form of retroactivity to make Abney's pre-Act crimes eligible for post-Act penalties, a view of the Act that both the government and the district court shared.

Congress enacted the Fair Sentencing Act of 2010, Pub. L. No. 111-220, 124 Stat. 2372, without any explicit provision addressing whether and how pre-Act offenders would be treated under the law. The language of the Act was forward-looking. Even the Court acknowledges today that "[t]he retroactive effect of the [Fair Sentencing Act] was ambiguious" as enacted. Maj. Op. at 15.

After President Obama signed the Act into law, courts confronted the question of the Act's possible retroactivity. This Court agreed with every other circuit court to address the issue: "there [was] simply 'no evidence that Congress intended the [Fair Sentencing Act] to apply to defendants who had been sentenced prior to the August 3, 2010 date of the Act's enactment." *United States v. Bigesby*, 685 F.3d 1060, 1066 (D.C. Cir 2012). For defendants who committed their crimes before that date but were sentenced *after* enactment, however, the results were more mixed.

Three circuits concluded defendants who committed their crimes before the Act took effect could not take advantage of its lower sentences, even if they were sentenced after the Act was implemented. *United States v. Fisher*, 635 F.3d 336, 339–340 (7th Cir. 2011) (holding Act does not apply to those who committed their crimes before August 3, 2010); *United States v. Sidney*, 648 F.3d 904, 910 (8th Cir. 2011) (same); *United States v. Tickles*, 661 F. 3d 212, 215 (5th Cir. 2011) (per curiam) (same). In his statement respecting the denial of *en banc* rehearing, Judge Easterbrook eloquently explained the reasoning behind this view. *United States v. Holcomb*, 657 F.3d 445 (7th Cir. 2011). Prior to its decision in *Dorsey*, the Supreme Court "never held any change in a criminal penalty to be partially retroactive." *Id.* at 446. Retroactivity had historically been an all-or-nothing proposition. Criminal statutes with retroactive application applied to all individuals regardless of the date on which they committed their crimes, while prospective statutes applied only to individuals who committed their crimes after the effective date of the new legislation. *See id.* This understanding of retroactivity did not depend on the date of sentencing, "which reflects how long it took to catch a

criminal, and the state of the district judge's calendar, rather than principles of deterrence or desert." *Id*. at 447.

Three other circuits concluded that pre-Act offenders could take advantage of the Act's lower mandatory minimums. These circuits adopted a "partial retroactivity" approach, in which the Act applied retroactively to those who committed their offenses before its enactment but were sentenced afterwards. These "partial retroactivity" circuits, however, could not agree on which date would make the critical difference for sentencing purposes. The First Circuit held the Act's new mandatory minimums applied only to defendants sentenced after the new sentencing guidelines went into effect on November, 1, 2010. *United States v. Douglas*, 644 F.3d 39, 46 (1st Cir. 2011). But in the Third and Eleventh Circuits, defendants received the benefit of the Act's new minimums if they were sentenced on or after August 3, 2010. *United States v. Dixon*, 648 F.3d 195, 203 (3d. Cir. 2011); *United States v. Rojas*, 645 F.3d 1234 (11th Cir. 2011).

"In light of [this] disagreement" among the circuit courts of appeals, the Supreme Court took up the Act's retroactivity question, and in a 5-4 decision, held "the Fair Sentencing Act's new, lower mandatory minimums apply to the post-Act sentencing of pre-Act offenders." *Dorsey v. United States*, 132 S. Ct. 2321, 2335 (2012). The Court *itself* acknowledged the partial-retroactivity interpretation was not obvious. Rather, the "timing issue…is difficult in part because relevant language in different statutes argues in opposite directions." 132 S. Ct. at 2330. Five members of the Court resolved the statutory chaos through a matrix of "six considerations, [which] taken together, convince us that Congress intended the Fair Sentencing Act's more lenient penalties to apply to

those offenders whose crimes preceded August 3, 2010, but who are sentenced after that date." *Id.* at 2331.

Given that background, it is impossible to say Abney's counsel performed incompetently by not asking for a continuance of Abney's sentencing. At the time Abney's counsel decided whether to seek a continuance, no court had yet enunciated the theory of partial retroactivity. Even when that theory emerged, federal courts divided over whether it was a proper interpretation of the Act. Moreover, the Supreme Court was *itself* divided over the theory, by a 5-4 vote. And even for those justices in the majority, the partial-retroactivity interpretation was, at best, a means of sorting out a tangle of statutory language pulling in different directions. In contrast to what the Court says, then, counsel here neither ignored established guidelines, *United States v. Soto*, 132 F.3d 56, 59 (D.C. Cir. 1997) (holding counsel was ineffective for ignoring a relevant Guideline provision), nor failed to demonstrate familiarity with *settled* legal principles, *Thomas v. Varner*, 428 F.3d 491, 501 (3rd. Cir. 2005) (stating courts routinely declare counsel ineffective when counsel fails to present a strong defense because of unfamiliarity with clearly settled legal principles), nor ignored *established* case precedent interpreting guidelines, *United States v. Gaviria*, 116 F.3d 1498, 1512 (D.C. Cir. 1997).

Here, counsel did not face "two reasonably likely but uncertain readings of the [Fair Sentencing Act]," as the Court insists. Maj. Op. at 15. Counsel had every reason to believe retroactivity would continue to be the all-or-nothing concept it had always been—retroactive or prospective, but nothing in between. *See Holcomb*, 657 F.3d at 446 (statement of Easterbrook, J.). It is irrelevant, as the Court states, that before *Dorsey*, some "defense attorneys argued—and some courts agreed" that the Fair Sentencing Act was susceptible to

a novel, partial-retroactivity interpretation. Maj. Op. at 15. Those arguments arose well after the time by which Abney's counsel would have had to decide whether to seek a continuance. Counsel's legal judgment cannot be impugned on the basis of creative arguments that were yet to be made.

The Court asserts the outcome of *Dorsey* was "reasonably likely," and therefore counsel should have taken steps to ensure that his client's interests were protected if this "reasonably likely" interpretation ultimately carried the day. Yet the analysis offers no support for its view that the *Dorsey* result was "reasonably likely" aside from its own say-so. The best the court can muster is the fact that some other defense counsel were seeking continuances at this time. This assertion, however, only demonstrates that *some* attorneys thought the date of sentencing might be of subsequent importance, not that *all competent* attorneys would think so. A few motions hardly serve as the kind of professional norm contemplated in *Strickland*. *See* 466 U.S. at 688. Furthermore, we have no comparison of the facts of these other cases. We do not know if these other defendants had also been the source of long sentencing delays, as Abney had been, or whether they had also committed their crimes long before the Act was even out of committee. We cannot measure Abney's counsel's conduct against the standard of these other defense attorneys without knowing that those attorneys found themselves in substantively similar positions.

Not only could Abney's counsel not have reasonably predicted the Court's partial-retroactivity approach in *Dorse*y, he was also laboring under the limitations of his client's case—which gave him sound, strategic reasons for not seeking a continuance. Under ordinary circumstances, a short continuance might be a small ask, but Abney's was no ordinary case: by the time of his scheduled sentencing

hearing, he had already been avoiding sentencing for nearly three years. After initially facing a ten-year mandatory minimum sentence, Abney had entered a plea agreement with the government in which he agreed to provide investigative assistance in exchange for his release with supervision. *See* Appellee Br. 3–4. Thus, he could, through his own initiative, dramatically reduce his sentence. But Abney could not bring himself to fulfill the conditions of his release: he tested positive for cocaine and marijuana; he "waterloaded" his urine samples in an effort to thwart his mandatory drug testing; he failed to appear for drug tests; and, ultimately, he lost contact altogether with supervising law enforcement. Above all of this, the government never received any cooperation from Abney. Realizing that they had been duped, the government obtained a sentencing date of October 13, 2009. Abney again managed to avoid sentencing, this time because Maryland authorities arrested and detained him on charges of attempted first-degree murder. J.A. 11. Abney's subsequent incarceration in Maryland forced the district court to postpone his sentencing twice. J.A. 14.

So it was that Abney arrived at his August 2, 2010, sentencing hearing, having already spent nearly three years—much of it as a free man—avoiding the imposition of his sentence. Indeed, it is a mere accident of history that Abney's Fair Sentencing Act near-miss is a near-miss at all. Had he been sentenced according to a more conventional schedule, he would have needed a continuance of at least many months, and likely years. A continuance of that kind would certainly not have been granted. *See, e.g., United States v. Fields*, 699 F.3d 518, 523 (D.C. Cir. 2012) (trial court did not abuse its discretion in denying postponement while Act was pending because pending legislation was too far off to be compelled consideration at sentencing) (internal citation omitted).

The problems with the Court's approach do not stop there. Even if Abney's counsel had suspected partial retroactivity would become the rule, on what date would retroactivity take effect? Would counsel have needed a continuance of ten days, enough time to allow the law to be signed? Or a few months, to allow time for new sentencing guidelines to be written and go into effect? *See United States v. Thompson*, 721 F.3d 711, 715 (D.C. Cir. 2013) (affirming district court's denial of a continuance and stay of sentencing several months prior to the Act's passage); *Fields*, 699 F.3d at 521 (same). Even the Court does not know how long the Constitution would require competent counsel to continue the proceedings. Maj. Op. at 20 (endorsing Abney's acknowledgment that whether August 3 or November 1 would be the relevant date was unclear, and yet holding such confusion cannot "validate counsel's failure" to seek a continuance of indeterminate length).

Even were we to accept that Abney's counsel performed ineffectively, Abney would still need to satisfy *Strickland*'s second prong by showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. Because the effect of *Dorsey* is to lessen the sentence of defendants sentenced on or after August 3, 2010, the prejudice question turns on whether Abney would have gotten a continuance had his lawyer sought one.

Continuances fall within the discretion of the trial judge, *United States v. Burton*, 584 F.2d 485, 490 (D.C. Cir. 1978), and are reviewed "only to determine whether the judge clearly abused his discretion." *United States v. Gantt*, 140 F.3d 249, 256 (D.C. Cir. 1998). Review must assess "the circumstances in every case, particularly in the reasons presented to the trial judge *at the time* the request is denied." *Ungar v. Sarafite*,

376 U.S. 575, 589 (1964) (emphasis added). The Court, relying on a hypothetical, dispassionate decision-maker—a "reasonable, conscientious, and impartial district court," Maj. Op. at 23—speculates that Abney's request would have been granted. In fact, we do not need to speculate about what would have happened if Abney's counsel had sought a continuance: the sentencing judge answered the question in his opinion below, saying he would have been *unlikely* to grant a continuance and further "delay reaching finality on a three-year-old plea." J.A. 87. The district court "considered whether the Fair Sentencing Act could benefit Abney, but came to the reasonable estimation that "it was unclear that [the Fair Sentencing Act] would even apply retroactively to Abney." *Id.* The district court concluded it was "completely speculative—not reasonably probable" that a motion for continuance to some "unspecified future date" would have been granted. *Id.* Given the broad authority district court judges have to manage their calendars and grant or deny continuances, the district court's assessment amounts to a reasonable exercise of discretion. The Court disagrees. Even after upending the *Strickland* standard, the Court can only make a case for prejudice by discrediting the district court as "[un]reasonable, [un]conscientious, and [ ]partial." *See* Maj. Op. at 23.

But abusing the district court is still not enough. Rather than defer to the sentencing judge's reasonable assessment of the likelihood of his granting relief, the Court takes yet another unpredictable step, relying on *de novo* review. Whether *de novo* review applies in these circumstances is a question this Circuit has left unanswered for nearly thirty years. *See*, *e.g.*, *United States v. Askew*, 88 F.3d 1065, 1071 (D.C. Cir. 1996). Today, the Court decides that question, and applying *de novo* review, it concludes that granting a continuance would have been likely.

At the heart of the Court's misreading of *Strickland* is a misapprehension about the realities of our republican form of government. The Court seems baffled that Congress would "insist on the near-immediate reduction of the 100-to-1 disparity in the Sentencing Guidelines for defendants sentenced after the [Fair Sentencing Act's] enactment but leave in place for those same defendants the old, unfair mandatory minimums." Maj. Op. at 18. Congress did not address retroactivity in the Fair Sentencing Act, in all likelihood, because it *could not* do so; had the Act taken up that issue, it may well have never garnered the votes necessary for passage. In our form of government, legislative compromise often produces *imperfect* outcomes. Here, those imperfections are most evident in the line-drawing problems caused by the new minimums. But this should not surprise the Court. *Dorsey*, in fact, recognizes that there are line-drawing problems with the application of the new minimums: pre-Act offenders who were also sentenced pre-Act remain in prison, serving lengthy sentences premised on a now-rejected cocaine-to-powder ratio. *See* 132 S. Ct. at 2335. The only solution for this disparity is a congressional act making the Fair Sentencing Act retroactive, even for pre-Act offenders; absent this, there is no way to even out the ratio-based sentences being served by all offenders.

Instead, the Court attempts to smooth out some of the disparity on its own, by moving Abney from the old, discredited sentencing regime into the new one. And it's not easy. First, the Court revises the *Strickland* test, from two prongs into one. Second, the Court decides to apply *de novo* review, forcing an answer to a question unsettled in this jurisdiction for more than thirty years. I do not doubt that in its determination to rescue Abney, the Court acts with good intentions. In *Dorsey*, the high court acted with similar

motives when it decided to pick and choose among opposing provisions to make the Fair Sentencing Act's more lenient provisions available to a larger number of defendants. That result might be what Congress should have adopted or would have enacted had decades of study produced sufficient votes. Instead, the Supreme Court fashioned an *ad hoc* measure to implement its widely-favored policy and in doing so offered neither rule nor guidance for future cases. If separation of powers is to have any meaning, the result in *Dorsey* cannot be deemed ordinary—certainly not so ordinary that counsel should be trained to expect it.

Here, trial counsel and the district court discussed, openly and on the record, that in order to benefit from the Fair Sentencing Act, Abney would need a *legislative* fix. Abney would need Congress to act in order to give him the benefit of the law. Today, the Court turns that healthy, constitutionally-grounded presumption on its head: not only did Abney not need to wait for Congress to make the Fair Sentencing Act retroactive, but his counsel was *incompetent* for thinking the legislature's involvement would be required. It is no longer enough for counsel to ask whether the courts *have acted* to fix some perceived problem Congress has caused; instead, counsel must *presume* both that courts can act and that they will. The failure to anticipate the "reasonable possibility" of judicial policymaking is proof of both counsel's incompetence and the district court's lack of conscientiousness—a result that seems both perverse and pernicious.